THE STATE v. WILLIAM SCHMULBACH,
Appellant.

Division Two, June 1, 1912.

1. IMPANELING JURORS: Opinions Based on Rumor: Appeal. The action of the trial court in impaneling veniremen who had formed opinions solely from rumor and newspaper reports, but who satisfied the court they could give defendant a fair trial, is not ground for reversal in this case.

2. INSTRUCTIONS: Murder: Using Deadly Weapon. Instructions on murder and as to the presumption arising from the use of a deadly weapon, couched in the form approved in State v. Grant, 152 Mo. 57, and State v. Hudspeth, 159 Mo. 178, are approved without comment other than that the evidence warranted them.

3. ————: **Flight: Mob Violence.** There was evidence that after the shooting for which the defendant is on trial, he lay in hiding for five weeks, in the city where it occurred, and that meantime, as he knew, armed men scoured the country and there were threats of mob violence. At the end of the five weeks defendant fled the State. The trial court instructed the jury that flight raises the presumption of guilt, but refused an instruction asked by defendant containing a paragraph substantially like that given upon flight and a further paragraph to the effect that though the jury might believe defendant fled, yet if he fled from fear of mob violence and not for the purpose of avoiding arrest and trial, the jury should not consider the circumstance of flight in making up their verdict. *Held*, that the judgment of conviction must be reversed and remanded for the failure to instruct as requested.

4. **EVIDENCE: Threats.** In a prosecution for murder, testimony to the effect that some twenty minutes before the defendant shot and killed a policeman who held his wife under arrest, he had said that "they [the police] will keep on until some of them get blowed up," was competent. The implied threat was directed against the class to which deceased belonged and its vagueness affected its weight, not its competency.

Appeal from Jasper Circuit Court.—*Hon. J. D. Perkins*, Judge.

REVERSED AND REMANDED.

*George A. Neal* and *Clay & Davis* for appellant.

The court erred in giving instruction 6 for the State upon flight, and in refusing to give instruction 25 for defendant upon mob violence. State v. Minor, 193 Mo. 597; State v. Foster, 130 N. C. 666; Smith v. State, 106 Ga. 673; State v. Gates, 20 Mo. 461; State v. Reed, 137 Mo. 125; State v. Hyeron, 157 Mo. 395.

*Elliott W. Major*, Attorney-General, and *John M. Dawson*, Assistant Attorney-General, for the State.

Threats made by appellant were admissible even a week or two prior to the homicide. State v. King, 203 Mo. 560; Underhill on Crim. Ev., secs. 328, 329, 576, 577, 578.

BLAIR, C.—Defendant was convicted of murder in the second degree and sentenced to thirty years in the penitentiary. He appealed.

The evidence for the State tended to show that on the night of November 15, 1909, Officers Smith and Graney of the Joplin police force, acting under a general order to arrest all women of bad character, arrested defendant's wife and one Minnie McDonald at 803 Main street in Joplin. When arrested the women demanded to know whether the officers had a warrant and were told they had not. They at first refused, on this account, to submit to arrest but changed their minds on condition that they be permitted to use the telephone to arrange for bond. This Mrs. Schmulbach did, leaving word with the prospective bondsman to inform her husband of her plight and have him also go to the police station. The message was delivered as requested. The officers and the women then left the place to go to the station, the former, at the suggestion of their prisoners, walking some little distance in advance in order that the fact the women were under arrest might not be advertised more than necessary. For the same reason the party proceeded westward toward Joplin street, a less traveled thoroughfare. As they crossed the street at the intersection of Eighth and Main and after the officers had passed some thirty or thirty-five feet west of and beyond the corner and the women had reached the corner and were on the sidewalk at the northwest corner of the street intersection, defendant, who had come south on Main street and reached a point near the corner, called to his wife, who walked north on Main street to meet him, her companion remaining on the corner. The officers were attracted by defendant's speaking to his wife, and by the fact their prisoners were no longer following them and one had started up another street, and started quickly back. Officer Graney testified that when he and Smith

reached a point five or six feet west of the door across the southeast corner of the building on the northwest corner of the intersection of Eighth and Main he heard some one say, "What's the matter here?" or, "What the hell is the matter here?" and defendant's wife replied: "They are taking us to jail and Graney struck me." Graney stepped past and in front of Smith and defendant came into view, stepped off the sidewalk at a point about eighteen feet from the officers, fired three or four times, ran into Main street and fired three or four shots more. Another eyewitness testified that defendant commenced the shooting, firing three shots; that the officers stepped back toward the building and fell against each other and then two or three more shots were fired, the reports being louder than before and witness thought these shots were fired by one of the officers. He had seen officer Smith's pistol in his hand before defendant fired. He heard no other shots. He heard some one say just before the shooting began: "There's the son-of-a-bitch, shoot him," and the firing immediately began. After firing, defendant ran and passed out of sight near the entrance to the alley next east of Main street. Graney was shot through both legs at the knee, and Smith was shot through the body, the latter dying of his wound on the following day. The evidence further showed that the officers were both in full uniform, and were wearing helmets and the usual policeman's badge. There were electric lights on the corner and the store buildings were lighted. There was also evidence tending to show that officer Graney's pistol was not fired on the night of the tragedy.

Defendant fled and was arrested in 1911 in Seattle, Washington, where he was living under an assumed name. To the officers who arrested him he gave his name as Harry Nye.

Considerable evidence was introduced by the State to the effect that the reputation of defendant's

wife and her companion, Minnie McDonald, for chastity was bad. This evidence was admitted over defendant's objection and the trial court, at the close of the evidence, both orally and in writing instructed the jury that they must disregard it. The women mentioned did not testify in the case.

There was evidence for defendant tending to show that his possession of a pistol the night of the shooting was the result of circumstances which showed he carried the weapon for no evil purpose.

Defendant testified in his own behalf that when he was told of his wife's telephone message and that she was under arrest he attempted to telephone her but could get no response. He then left the saloon in which the message was delivered to him and started to his home at 803 Main street, proceeding south until he saw the two policemen and his wife and Minnie McDonald following them. He called to his wife and she came north on Main street to meet him. She was crying and defendant asked her what was the matter. She replied that she was arrested. Defendant then asked her what she was crying about and she answered that ''Tim'' (Officer Graney) had struck her. Just then the officers who had been just around the corner, ''turned the corner with a rush'' and as they did so one of them, according to defendant, said: ''There is the son-of-a-bitch! Shoot him.'' Officer Smith had a pistol in his hand. Defendant declared that both he and the officers then began to fire, and he was not certain who fired the first shot. He testified that he fired at this time five shots and the officers fired one, firing a second shot after he (defendant) turned to run. He said the reason he fired was that ''when he made that remark I thought he was going to shoot me, that was the only thing I could figure out, and probably kill me.''

1. The information, with sufficient clearness and certainty, charges defendant with murder in the first

degree, and need not be set out in this opinion, no question concerning it being raised by counsel.

Neither need the exception saved in connection with the impanelment of the jury be discussed at length since, under the statute and the settled rule in this State, as counsel concedes, the action of the court in impaneling veniremen who had formed opinions solely from rumor and newspaper reports but who satisfied the court they could give defendant a fair trial, is not ground for reversal in this case.

2. One of the grounds of motion for new trial is that the court erred in its instructions on murder and that as to the presumption arising from the use of a deadly weapon. These instructions are in a form heretofore approved (State v. Grant, 152 Mo. 57; State v. Hudspeth, 159 Mo. 178) and further comment is unnecessary, except to say that the evidence warranted the court in giving them.

3. Upon the subject of flight the trial court instructed as follows:

"The court instructs the jury that flight raises the presumption of guilt, and if the jury believe and find from the evidence that the defendant after the alleged shooting of William Smith, charged in the information, fled from the State of Missouri for the purpose of avoiding arrest and trial for said offense, you may take this fact into consideration in determining his guilt or innocence."

In this connection defendant's counsel requested and the court refused an instruction containing a paragraph substantially like the instruction given and a further paragraph to the effect that though the jury might believe defendant fled, yet if he fled from fear of mob violence and not for the purpose of avoiding arrest and trial the jury should not consider the circumstance of flight in making up their verdict. There was evidence that in a short time after the shooting defendant went to the home of his brother-in-law in

Joplin and remained there in concealment about five weeks, then left the State and went to Washington. There was evidence that the shooting immediately created great excitement, that armed men scoured the country for defendant, that threats of mob violence were made and that sentiment was much aroused against him. Defendant's brother-in-law testified he informed him of these facts and, on account of them, urged him to remain in hiding. There was evidence that it was for these reasons defendant first concealed himself and subsequently left the State.

In State v. Harris, 232 Mo. 317, the question now presented was passed upon and that judgment was reversed and the cause remanded solely by reason of the trial court's omission to instruct as the court below refused to instruct in this case. The reasons then given need not be rehearsed. It is enough to say that the principle upon which that case was decided is exactly applicable in this and, consequently, this judgment must be reversed and the cause remanded.

4. In view of the fact that the cause must be reversed for reasons already given it is not necessary to discuss the question whether the evidence as to the reputation of Mrs. Schmulbach and Minnie McDonald was prejudicial to defendant. Doubtless the trial court will exclude that evidence on a retrial, unless other circumstances make it competent. Drain's testimony to the effect that some twenty minutes before the shooting, speaking of the action of the police in arresting numerous women, defendant said that "they [the police] will keep on until some of them get blowed up," was competent. The implied threat was directed against the class to which deceased belonged and its vagueness affected its weight, not its competency.

As to other questions argued here it is only necessary to say that we cannot, in the circumstances, safely undertake to forecast the evidence upon another

trial and rule in advance thereof upon the issues which should be submitted to the jury.

The judgment is reversed and the cause remanded. *Roy, C.,* concurs.

PER CURIAM.—The foregoing opinion of BLAIR, C., is adopted as the opinion of the court. All the judges concur.