THE STATE v. NORMAN HERRING and J. F. BALDWIN, Appellants.

### Division Two, July 5, 1916.

1. **JUROR: Prior Opinion.** The fact that a juror has made up his mind from what he saw in a newspaper is no ground for challenge after he has stated he can disregard that opinion and decide the case solely from the evidence.

2. **WITNESSES: Competency: Harmless Testimony.** The court will not on defendant's appeal consider the competency of witnesses confined as patients in an insane asylum where they testified to nothing having a tendency to convict defendant, and their testimony was really favorable to him and could not have harmed him.

3. ———: ———: **Person of Unsound Mind: Patient Confined in Insane Asylum.** Under the statute declaring that "a person of unsound mind at the time of his production for examination" shall be incompetent to testify, a person adjudged to be of unsound mind who is confined in an asylum for the insane is presumed to continue insane; but such presumption may be rebutted by a proper voir dire examination conducted by the court, and such a person is competent to testify if (1) upon examination he be found to be of sufficient mental capacity to understand the nature of an oath, that is, to know it is both a moral and legal wrong to answer falsely, and that false swearing is a punishable crime in law, and (2) if he be possessed of sufficient mind and memory to observe, recollect and narrate the things he saw or heard.

State v. Herring and Baldwin.

4. ——: ——: Presumption: Burden: Credibility. The burden of rebutting the presumption of incompetency cf a witness confined in an insane asylum is upon the party offering him; but absent such confinement, or an adjudication that he is insane, the burden of showing his incompetency is on the party objecting. And while the question of his incompetency is for the court, it is for the jury to determine the credit that ought to be given to his testimony.

5. INSTRUCTION: Reference to Information. An instruction which refers the jury to the information for matters which are not in the instruction and which are necessary for their consideration, is erroneous; but it is not erroneous if, in spite of such reference, it contains the matters necessary for their consideration, but such reference is merely surplusage and harmless.

6. ——: Non-Direction: Manslaughter: Force by an Officer. An instruction which tells the jury that defendants, officers of an asylum for insane persons, had the right to use all force necessary to control the assaulted patient, and that if the jury should find that they did unnecessarily strike, beat and injure said patient with their feet and fists, and that said patient died therefrom, they should find them guilty of manslaughter in the fourth degree, was correct as far as it went; and if defendants desired to have the jury instructed to the effect that defendants were not required to nicely gauge the amount of force necessary to subdue the patient and that they had the right to use such force as reasonably seemed to them necessary for that purpose, it was their duty to ask for such instruction, and having failed to do so they cannot complain, since the complaint is one of non-direction, not one of misdirection.

Appeal from Buchanan Criminal Court.—*Hon. Thomas F. Ryan,* Judge.

AFFIRMED.

*Elliott Spalding* and *Stephen K. Owen* for appellants.

(1) It was prejudicial error to refuse the challenge for cause on the part of the defendants of venireman Rogers. Sec. 5220. R. S. 1909. This man not only had an opinion, but had expressed it, and that opinion was not only an opinion, but it amounted

to a definite determination of the guilt of the defendants. (2) No crime was committed, proven or shown. The testimony not only fails to prove any crime, but strongly disproves any crime or intention to commit even an infraction of the asylum rule. The State's evidence, apart from any proof adduced on the part of the defense, disproves any guilt. (3) The court erred in permitting to testify on behalf of the State and over the objections of the defendant three insane patients, inmates in the asylum for the insane at the time of the homicide, and at the time of their production as witnesses, and admittedly "adjudged" insane. Sec. 6362, R. S. 1909. These men having been adjudged insane by courts of competent jurisdiction, they were insane and of unsound mind, and the trial court had no power to inquire into their competency at the time of their production. The adjudication of these men as to their being insane, together with their confinement in the asylum fixes their status, and brings them within the statute and fixes their incompetency, and no collateral hearing or attempt to qualify them could make them competent. The binding force of an oath is based upon two things: First: The religious faith and beliefs of the witness, and his belief in God, with a proper appreciation of solemnity of calling upon Him to witness the truthfulness of the testimony, and the fear of punishment and future retribution if such testimony be false. Sec. 6349, R. S. 1909; Sec. 6353, R. S. 1909. Second: The fear of temporal punishment and the penalties for swearing falsely or committing the crime of perjury. Secs. 4344 and 4345, R. S. 1909. Had these witnesses cunningly devised or insanely conceived some parts of their testimony, which appellants contend a part of these witnesses did, to vent a spleen for a grievance, real or imagined, against one of these defendants, they could not be punished

for perjury. The very discussion by the court with these witnesses of the punishment to be meted out by the law made the matter worse for these defendants, for it brought to the attention of the witnesses their condition; and if they had mind sufficient to make them desirable witnesses for the State, then they had mind enough to know of their immunity from punishment, however false their testimony might be. The decisions in State v. Whitsett, 232 Mo. 527, and State v. Vaughn, 223 Mo. 155, are not squarely in point. (4) The instruction is deficient, misguiding and wholly silent as to defendants' rights and as to those matters that temper the law to accord with human weakness when sudden passion on provocation arises, and is altogether prejudicial to these defendants, and totally oblivious to their rights. State v. Watson, 95 Mo. 416; State v. Umfriend, 76 Mo. 407; State v. Young, 99 Mo. 666; State v. Speyer, 207 Mo. 556; State v. Lewis, 118 Mo. 79; State v. Davidson, 95 Mo. 155; State v. Ellis, 74 Mo. 215; State v. Weakley, 178 Mo. 422; State v. Jones, 79 Mo. 444; State v. Elsey, 201 Mo. 571. This instruction is faulty in that it does not require the jury to find that the defendant intentionally killed deceased. State v. Hearney, 177 S. W. 305; State v. Umfriend, 76 Mo. 407; State v. Sloan, 47 Mo. 614; State v. Edwards, 70 Mo. 482.

*John T. Barker,* Attorney-General, and *W. T. Rutherford,* Assistant Attorney-General, for the State.

(1) When a juror on his *voir dire* examination declares that his opinion is not such as to bias or prejudice his mind, and that his opinion will readily yield to the evidence in the case, he is a competent juror. State v. Church, 199 Mo. 629; State v. Darling, 199 Mo. 196; State v. Sykes, 191 Mo. 75; State v. Sherman, 264 Mo. 379. (2) Upon their *voir dire*

examination the witnesses Fitzpatrick, Murphy and Hoffman, inmates of the hospital, showed that they had sufficient understanding to comprehend the obligations of an oath and were capable of giving a correct account of what they had seen and heard of the difficulty between appellants and the deceased. The competency of these witnesses was a question for the court. State v. Myers, 37 L. R. A. (Neb.) 424, and notes; State v. Pryor, 46 L. R. A. (N. S.) (Wash.) 1028, and notes; State v. Whitsett, 232 Mo. 527; State v. Vaughn, 223 Mo. 155. (3) The jury having failed to assess the punishment after having determined the guilt of the defendants, it was the duty of the court to assess it. Sec. 5254, R. S. 1909; State v. Rollins, 226 Mo. 538; State v. Foster, 115 Mo. 448. (4) Instruction number 4, taken with the other instructions, correctly defined manslaughter in the fourth degree. State v. Montgomery, 230 Mo. 666; State v. Rose, 142 Mo. 427.

ROY, C.—Defendants were charged with murder in the second degree and convicted of manslaughter in the fourth degree. The jury disagreed as to the punishment. The court sentenced Herring to two years in the penitentiary, and Baldwin to pay a fine of five hundred dollars. They have appealed.

They were both employed as attendants in ward 3 of Hospital Number Two for the Insane at St. Joseph. They both had several years' experience in such employment and the evidence shows that they had been previously careful in such work. Ward 3 was one in which violent patients were confined, but other patients were kept there to do certain parts of the work necessary in caring for the patients. Joshua Wallace and George Young were two of the most dangerous patients in the ward. About December 15, 1904, Wallace had bitten off a large portion

of one of the ears of defendant Baldwin. He had a reputation for biting. He was about twenty-eight years old. Both he and Young were about the average in size and strength. Wallace had worn "restraints" for a considerable period of time, but they had been removed several days prior to the alleged offense. Those restraints were leather straps around his body and around his wrists.

Patrick J. Fitzpatrick, one of the patients, testified for the State as follows: "A. Well, that morning before we went to breakfast Wallace was going around mumbling. He was a vicious patient, a man that would bite. He was going around mumbling over them coming out. He was not a crazy man, he was just simply mad, acted like he was mad and foamed at the mouth. He was going around mumbling and he kept that up before breakfast. After breakfast he got worse, I mean he acted like he was going to do something. Murphy was at the back end of the hall—

"Q. Who is Murphy? A. He is a patient in ward 3. Murphy kind of went toward him. I was in the middle of the hall. I thought I would go back and help Murphy quiet him down. I knew the attendants were at breakfast, and when I got back there the attendants came back behind me, and when I saw them I thought there was plenty to handle him and I went back to my work, and they had led him off the hall.

"Q. Who led him off the hall? A. Mr. Herring and Mr. Baldwin. I think Mr. Smith came back there.

"Q. Tell the jury whether or not Murphy had any fight with Wallace? A. None whatever. They were just talking. Murphy was trying to quiet him so they would not hit one another.

"Q. You say Mr. Herring and Mr. Baldwin led the patient Wallace off the hall? A. They caught hold of him right at the entrance of the hall. It occurred right along there, and they got up to the en-

trance and took hold of him by the arms and led him out just like this, one on each side like this. Then I went back to my work.

"Q. Do you know how Wallace went around to make assaults upon patients that he was angry with, or on attendants? A. He went like a mad man.

"Q. Did he go with his mouth open? A. Yes, his mouth was open and he was frothing."

Thomas J. Murphy, another patient, testified:

"Q. I wish you would turn to these gentlemen and tell what occurred between Mr. Wallace and Mr. Herring and Mr. Baldwin on this Sunday morning that Mr. Wallace was killed? A. For the information of the jury, the ward is ward 3. It was just about breakfast time, after the patients had had their breakfast and the attendants, the gentlemen mentioned, had just about finished their breakfast, and Mr. Wallace, who was running a rubber, there were about thirteen or fourteen other men running rubbers, and they kept passing by where I was stationed. I was stationed at the table which belonged to these gentlemen mentioned, these attendants, and where they kept their property in the table and their reports. I watched it while they were out. On this last turn around Mr. Wallace stopped where I stood and made the remark, 'Those men didn't get all that was coming to them, didn't get enough,' and when he made the remark I told him he had to keep still and go on with the rubbing.

"Q. It was your business to help with the keeping of the patients? A. Yes, and to call their attention to them if they tried to make trouble. By calling attention to a patient always some attendant responds, and we work that way. Mr. Herring and Mr. Baldwin had about that time started out of the dining room, and I walked along with Wallace so he would keep on with the rubber, so I met them coming

on and told them what Mr. Wallace had said in re-
gard to themselves, and they started to quiet Mr.
Wallace the way they had before, that is, take him a-
way so that he would not make any trouble, that is
take him to the anteroom.

"Q. What anteroom? A. There is a little ante-
room that belongs to the ward, is a part of the ward.

"Q. Is that near the bathroom? A. Yes, from
the anteroom, you pass into the toilet."

He further testified that the defendants took
hold of Wallace and led him to the door and out of
sight of the witness, who saw nothing that occurred
between them after that.

Defendant Baldwin testified that when, he went
into the hall Murphy told him that Wallace had said
"they didn't get enough and were going to get some
more." He further testified as follows:

"A. We took him by the arms and started to
bring him in here, and when we got here he resisted
and jerked away and started in this doorway and
started to fight. Mr. Herring was ahead of me, and
so I couldn't see just what happened. Mr. Herring
either shoved him or struck him and he fell kind of
staggering backwards and fell back in here, and with
his head between the radiator and the bath tub, and
Mr. Crain, another patient—

"Q. Where was Crain? A. He was inside the
bathroom drawing a bucket of water with a little
piece of hose attached to the faucet where he was
drawing the water into the bucket.

"Q. This is the rubber hose that has been intro-
duced in evidence? A. Yes, sir. Mr. Herring was
ahead and that is the first thing I seen, the rubber
hose. I grabbed that off the faucet, I think Mr.
Crain grabbed the right arm and Mr. Herring the left
arm, and as he came up I struck him twice with the
hose just across the neck, and as I struck him he

kicked me in the stomach and back to where the wash basin was, and Mr. Young, another patient, was in the stool room there, or had been.

"Q. What did Mr. Young do? A. He came out and just as he kicked me back Mr. Young grabbed him by the feet and jerked his feet out and he fell in here on his right side and turned some way so he struck his right side.

"Q. Do you know what he did strike as a matter of fact?

"A. I don't know. It might have been the radiator. I presume it was the radiator.

"Mr. McDaniel: I object to his presumption.

"The court: Don't state your presumption. State what you saw. Don't state what you think.

"A. Well, it looked to me like he struck the radiator or the floor in front of him. I think it was the radiator. That is what it looked to me like. And immediately after he struck him Young jumped out on him with his feet and he stood with one foot here and he stamped him five or six times before either of us could get to him, it was done right quick, and we pulled Young off, Herring and I did."

He testified that neither he nor Herring kicked Wallace.

Defendant Herring testified that when he got near where Wallace was Fitzpatrick and Murphy told him that Wallace had made threats; and, as to the difficulty, he testified:

"I undertook to see what was the difficulty between these patients and as soon as I saw there was apt to be some disturbance with him, we made an effort to get him away from these two benches of infirm patients for fear he would hurt some of them, and we naturally crowded him to the back through this back hall, and when we got through he breaks lose and backs into this door and into the bath room.

He stopped right in the door facing us, so only one man could approach him at a time. He puts up a defense by striking at me five or six times.

"Q. Did he hit you? A. No, I was not in reach of him at the time. He then made a violent strike and started to fall into me, and to keep him from biting me as he intended to do I gave him a shove with my hand against the left side of his face and he staggered back across the bath room.

"Q. Did you strike him? A. No, I shoved him, and he staggered back and fell on his head and shoulders with his head between the bath tub and the radiator. That is a distance of about ten feet, I suppose.

"Q. What did you shove him for? A. I shoved him to keep him from clinching me and biting me. That is what I expected him to do. When he went down he didn't lay there, he started to get up, and as he made an effort to get up Everett Crain, a patient, who was standing inside the bath room door, he takes hold of one of patient Wallace's arms, I believe it was his right arm, and I was on the other side, I believe I took hold of his left arm, and as he starts to get up Mr. Baldwin—the first thing he sees is a piece of hose connected on the pipe where Mr. Crain was working—he takes the hose off—I don't know whether to use it himself or to keep the other patients from using it—and as Mr. Wallace starts to get up he strikes him a couple of times across the head. He stepped back and Wallace kicked him in the stomach and he kicked him back nearly to the lavatory on that side. George Young, another patient, was standing in this door that connected the water closet with the bath room, but at the time that Mr. Baldwin hit him and Mr. Wallace kicked Mr. Baldwin, Young had shifted his position and he hit him in such a way that Mr. Wallace falls loose from myself and

Mr. Crain, his head falling towards the radiator.  I am not positive that he struck anything, but I know his head struck the floor, and possibly the radiator as he went down.  And when he went down striking his head against the radiator or floor, George Young, the same patient that had pulled his feet from under him, he took advantage of the situation by jumping upon him  and he kicked him four or five  times  with  one foot while he stands on him with the other, and Mr. Baldwin and I pulled him off as quick as possible."

He further testified that blood and food came from Wallace's mouth as he lay on the floor.  He denied that he kicked Wallace.

Everett Crain, a patient in the asylum, who was discharged about a week before the trial, was put on the stand by the defendants.  He testified that he was in the bath room drawing a bucket of water; that Wallace backed into the room fighting those who followed; that Herring hit Wallace with his hand and knocked him down; that Wallace staggered four or five feet and fell between the radiator and the bathtub, his head not hitting the floor, and that he then came back on his feet.  He further testified:

"A.  As Mr. Wallace came up, he had almost gotten to a standing position, I had hold of his right arm and Mr. Herring had hold of his left arm, and Mr. Young came through the door and Mr. Wallace kicked with his left foot, I couldn't swear where he hit Mr. Young at, but Young went against this radiator, and then Mr. Baldwin hit Wallace twice over the head and Young backed around in here and jerked his feet from under him.  When he went down, Mr. Herring and I let loose of his arms and when he went down his head struck this radiator or bath tub.  Then Mr. Young went on his chest or stomach and as quick as Mr. Herring and Mr. Baldwin could get him off they done it."

He further testified on cross-examination:

"Q. Now who else there kicked Mr. Wallace besides Mr. Young? A. I and Mr. Herring. Mr. Herring, I couldn't swear whether his lick ever hit Mr. Wallace or not."

The evidence shows that after it was ascertained that Wallace was seriously injured the defendants made every effort in their power to resuscitate him.

Joseph Hoffman, a patient in the third ward, testified for the State that he went into the wash room and saw Wallace lying on the floor unconscious, with the leather straps on his hands and around his body, while the others stood around him. All the other evidence showed that there were no straps on him.

Dr. Woolsey, one of the hospital physicians, testified that defendant Herring told him that he (Herring) hit Wallace with his knuckles, knocking him about five feet, and that he fell between the radiator and the bath tub.

The autopsy revealed that the head and face of deceased were bruised and swollen in various places, that there was a red stripe on the side of the face from chin to ear, the entire front of the chest was bruised, as was the abdomen to the hips, the arms were bruised, seven ribs and the breast bone were broken, and the heart was pierced by a splinter from off the ribs, the intestines were torn from their connections in many places.

The defendants, while on the stand, were asked why, after Wallace's death, they did not tell that Young had stamped the deceased, and answered that they did not know until after the autopsy about the damage done to the chest of the deceased.

The three State's witnesses, Murphy, Fitzpatrick and Hoffman, had been adjudged insane. The defendants objected to them as incompetent on that ground, which objection was overruled. We shall not state

the facts as to the competency of Fitzpatrick and Murphy, for the reasons given in the opinion. The witness Hoffman was forty-four years old, born in Germany, and had been in the hospital nearly twelve years. He was a bachelor. He was examined out of the presence of the jury to determine whether he was a competent witness. The questions put to him and his answers cover about six pages of the transcript. We can see no indication of mental weakness in that examination. The closing part of it is as follows:

"Examination by The Court.

"Q. Do you know what it is to be sworn in court? A. Yes, sir. Q. Do you know you would be punished if you swore to a lie in court? Do you know that the law punishes anybody that would swear to a lie? Do you know what is meant when you hold up your hand and say I promise to tell the truth so help me God? A. Yes, sir.

"Q. Do you know what you would be? A. A person can make himself a meineid by speaking falsely.

"Q. Suppose he does make himself speak falsely after he is sworn would he be punished? A. I suppose he would.

"Q. Punished by the law? A. Yes, sir.

"Q. You know that is true, do you? A. Yes, sir.

"Q. Would he be punished otherwise hereafter? A. If they would find out.

"Q. If they find out he has sworn falsely he would be punished by the law? A. Yes, sir.

"Examination by Mr. Cave.

"Q. Mr. Hoffman, what do you mean when you take an oath in court. What do you understand it to mean? A. Well, to tell what is right, what is correct.

"Q. Would you be any more likely to tell what is correct after you had taken an oath? A. If I am sworn in court I am sworn to tell the truth if I know it.

"Q. Suppose you didn't tell the truth, do you know whether that is wrong, morally or legally? A. A person knows what is right and believes it.

"Q. If they know it they tell it? A. Yes, sir.

"Q. Is it your idea that you can and will tell the truth about it? A. I wont tell an untruth if I know it.

"Q. Are you certain when you are telling the truth about anything that happened there? A. I guess it is all correct.

"Q. Are you certain about that? A. Yes sir.

"Q. What would happen to you if you would make a mistake and not tell the truth. A. Of course, a person might forget.

"Q. Might forget about it? A. Yes.

"Q. Are you somewhat forgetful. A. No, not so easy.

"Q. What were you sent to the asylum for, Mr. Hoffman? A. I dont know what they charged me up for.

"Q. You don't know what the matter was? You don't know what the trouble was, do you? A. I don't know exactly what you call it.

"The court: This witness, of course, is at a disadvantage. He is a foreigner and doesn't speak our language very well. As far as his mentality goes, I don't think he has shown that he has not enough mentality to testify."

Dr. Woolsey testified, that Hoffman was reasonably competent to understand facts and relate them on the stand, that he knew right from wrong and the meaning of an oath, and that the record showed that

there was no change in his condition in the last four years.

Dr. Woodson testified that if Hoffman was as intelligent all the time as he then was he was well enough to go home.

The court then permitted Hoffman to testify.

One of the jurors on his examination stated that he had made up his mind from what he saw in the paper, had expressed that opinion, that he still had that opinion, that it would take evidence to remove it, but that he could disregard that opinion and reach his verdict solely from the evidence in court. Defendants' challenge of the juror was overruled by the court.

The fourth instruction was as follows:

"The court instructs the jury that the defendants had the right to use all reasonable force necessary to control the deceased Joshua Wallace, and if you find and believe from the evidence that the defendants to effectuate said purpose of attempting to control the deceased Joshua Wallace did unlawfully and unnecessarily strike, beat and injure the deceased Joshua Wallace with their fists and feet in the manner set out in the information, and that the deceased died from said beating and striking at the county of Buchanan and State of Missouri on or about the 7th day of February, 1915, then you will find the defendants guilty of manslaughter in the fourth degree, and assess their punishment at imprisonment in the penitentiary for the term of two years, or by imprisonment in the county jail for not less than six months, or by a fine of not less than five hundred dollars, or by both a fine of not less than one hundred dollars and imprisonment in the county jail not less than three months."

State v. Herring and Baldwin.

I. The fact that the juror had made up his mind from what he saw in the news-

**Juror.**    paper was no ground for challenge after the juror stated that he could disregard that opinion and decide the case solely from the evidence. [R. S. 1909, sec. 5220; State v. Rasco, 239 Mo. 535; State v. Schmulbach, 243 Mo. 533.] Appellant has cited    no    authority    to    the    contrary.

II. The    State's    witnesses    Murphy    and Fitzpatrick were really favorable to the defendants. They testified to the

**Competency of Witnesses.**    dangerous disposition of Wallace and of Young and told defendants of the threats made by Wallace. That they did so tell defendants is shown by the evidence of the defendants. Those witnesses did not testify to a single thing having a tendency to convict the defendants. So far as their evidence goes, the defendants, up to the time they passed out of sight of those witnesses, were doing nothing more than their duty. As the testimony of those witnesses could not have harmed the defendants we decline to consider the question of their competency.

III. The trial court, in passing upon the competency of witnesses who have been adjudged insane, said:

"I think the fact that this man may have been adjudged insane, is not a conclusive presumption that he is incompetent. The law is that the presumption is that when one on a proper inquisition has

**Insane Witness.**    been adjudged insane, he is insane, and before he can become a competent witness in any case it must be shown that he has lucid moments and that at the time he is offered as a witness he has sufficient mind for the court to determine that he had mind sufficient

268 Mo.—34

to observe the facts and rationally relate what occurred. If you gentlemen have any authority to the contrary, I will be glad to hear it. I have looked up this question in every text-book I have in my office. I have read Underhill's Criminal Evidence, I have read Elliot, and I have read the last work—I can't recall the name—I have read all the late rulings on this point."

That opinion is supported by Underhill on Crim. Ev. (2 Ed.), sec. 202; 2 Elliott on Ev., sec. 757; 1 Wigmore, Ev., sec. 497; 30 Am. & Eng. Ency. of Law (2. Ed.), 935-bb; State v. Meyers, 37 L. R. A. 423; State v. Pryor, 46 L. R. A. (N. S.) 1028; and Hottle v. Weaver, 206 Pa. St. 87. In State v. Vaughn, 223 Mo. l. c. 155, it was held that a person committed to a hospital for the insane is presumed to continue insane. There was no evidence in that case to rebut the presumption, and there was no occasion to consider the effect of such evidence, but the court there cited authorities which held that such presumption is not conclusive.

We have a statute which provides upon this point thus: "The following persons shall be incompetent to testify: First, *a person of unsound mind at the time of his production for examination,*" etc. [Sec. 6362, R. S. 1909.]

It was, as suggested above, held in the case of State v. Vaughn, 223 Mo. l. c. 155, that since the proof made in that case showed that the person whose testimony was in issue as to its competency, was an inmate of an asylum for the insane, the presumption was that she was insane, and therefore incompetent. Taking as premises our statute which seems to have been enacted in 1855, and the presumption which follows an incarceration in a state asylum for the insane, can an inmate of such asylum be a competent

witness? The question is a serious and troublesome one, as will be shown infra.

In the early days of the common law insanity of the proposed witness rendered him absolutely incompetent. An early (1842), edition of Greenleaf on Evidence, thus states the old rule:

"It makes no difference from which cause this defect of understanding may have arisen; nor whether it be temporary and curable, or permanent; whether the party be hopelessly an idoit or maniac, or only occasionally insane, as a lunatic; or be intoxicated; or whether the defect arises from mere immaturity of intellect, as in the case of children. While the deficiency of understanding exists, be the cause of what nature soever, the person is not admissible to be sworn as a witness."

This rule of absolute incompetency at common law prevailed from early time (Coke upon Litt. 246b; Comyns' Dig.—Testimony, A-1; Livingston v. Kiersted, 10 Johns. (N. Y.) 362) down to a day comparatively recent. [Greenleaf on Ev., supra.] The trend of all the later cases, however, and the universal rule at common law, now is that the lunatic may be sworn and may testify as a witness; provided, upon examination by the court (who is the sole judge of his competency, subject to review on appeal for an abuse of discretion) he shows that he understands the nature of an oath and that he possesses mental capacity sufficient to observe and recollect and narrate the things he saw or heard. [Walker v. State, 97 Ala. 85; McKinstry v. Tuscaloosa, 172 Ala. 344; Worthington v. Mencer, 17 L. R. A. 407; Armstrong v. Timmons, 3 Har. (Del.) 342; Cannady v. Lynch, 27 Minn. 435; State v. Crouch, 130 Iowa, 478; Cuesta v. Goldsmith, 1 Ga. App. 48; People v. Enright, 256 Ill. 221; Holcomb v. Holcomb, 28 Conn. 177; Regina v. Hill, 5 Cox Crim. 259; Cogan v. Cogan, 202

Mass. 58; District of Columbia v. Armes, 107 U. S. 519; State v. Hayward, 62 Minn. 474; 40 Cyc. 2201; State v. Simes, 12 Idaho, 310; Bowdle v. Railroad, 103 Mich. 272; Railroad v. Thompson, 27 C. C. A. 333; Barker v. Washburn, 200 N. Y. 280; Covington v. O'Meara, 133 Ky. 762; Coleman v. Comm., 25 Gratt. (Va.) 865; Evans v. Hettich, 7 Wheat. 453; State v. Cremeans, 62 W. Va. 134; Czarecki v. Railroad, 30 Wash. 288; Guthrie v. Shaffer, 7 Okla. 459; Batterton v. State, 52 Tex. Cr. 381; Singleton v. State, 57 Tex. Cr. 560; Burns v. State, 145 Wis. 373; State v. Brown, 36 Atl. (Del.) 458; Kendall v. May, 10 Allen (Mass.), 59.]

Our statute upon this question, which we quote above, has never been construed upon the precise point now before us. For while, as stated above, it was said in State v. Vaughn, 223 Mo. l. c. 155, that a person of unsound mind who is committed to an asylum for the insane, *is presumed to continue insane,* yet it is not ruled in the Vaughn case *whether such presumption may or may not be rebutted* by *voir dire* examination or otherwise. In State v. Whitsett, 232 Mo. 511, the precise point here presented was not before the court, and what is there said is not decisive and only remotely analogous. The question is therefore one of first impression in this State, and must be resolved upon the terms of our own statute, aided persuasively by the rulings on similar statutes in other jurisdictions; for as we have seen the common law rule is universally in favor of competency of such insane witness upon a proper and sufficient showing on his *voir dire* examination.

Upon principle and on first blush, it would seem that under our statute one confined in an asylum for the insane is rendered absolutely incompetent as a witness, and that the presumption arising from the fact of such incarceration (State v. Vaughn, supra)

is not rebuttable collaterally. But it was pointed out by CAMPBELL, C. J., in the case of Reg. v. Hill, 2 Den. & P. C. C. 254, that such a rule "would be extremely inconvenient in many cases in the proof either of guilt or innocence; it might also cause serious difficulties in the management of lunatic asylums."

It has also been strenuously urged that an incarcerated or adjudicated lunatic would be, while giving his testimony, freed from the restraining fear of the pains and penalties of perjury; that being confessedly insane and confined as such, no jury would convict him of perjury. The answer would seem to be that the witness upon his *voir dire* examination must as one test of competency show his mental appreciation of the criminality of false swearing; it must appear that he knows that perjury is morally wrong and that one committing it is liable to be punished by the criminal law. Moreover, a ten-year-old child is prima-facie competent as a witness in this State (State v. Anderson, 252 Mo. 83); children under ten may be shown to be admissibly competent (Sec. 6362, R. S. 1909); yet the possibility of a conviction by a jury for perjury is procedurally and practically as remote in the case of such child witnesses as it is in the case of an insane person. But however this may be, many states of the Union have statutes either verbatim as ours, or similar in substance and meaning to ours, *yet without a single dissenting voice* the matter of competency of an insane person to testify has, all such statutes notwithstanding, been said to rest wholly upon a proper *voir dire* showing as at common law. In Nebraska the applicatory statute forbids "persons of unsound mind at the time of their production" from testifying; held, notwithstanding, that the question of competency is one for "the sound legal discretion of the trial judge, leaving to the jury to de-

termine the credit, that ought to be given to the testimony." [State v. Meyers, 46 Neb. 152.]

The Idaho statute upon this point reads: "The following persons cannot be witnesses: Those who are of unsound mind at the time of their production" for examination. Held, that such statute is only declaratory of the common law rule and competency as at common law appearing to the satisfaction of the trial court upon *voir dire* examination, the insane witness may testify. [State v. Simes, 12 Idaho, 310.] In Minnesota the statute renders incompetent as witnesses "all who are of unsound mind when produced as witnesses." Held, that an insane person is not necessarily incompetent; such question being determinable by the trial court on the basis of the witness's knowledge of right and wrong and his power of memory. [Cannady v. Lynch, 27 Minn. 435; State v. Hayward, 62 Minn. 474.] Similar are the statutes and the rule in Oklahoma (Guthrie v. Shaffer, 7 Okla. 459; Adams v. State, 5 Okla. Crim. 347); in Ohio (Railroad v. Thompson, 27 C. C. A. 333); in California (Clements v. McGinn, 33 Pac. 920); in Georgia (Cuesta v. Goldsmith, 1 Ga. App. 48); in Montana (State v. Berberick, 38 Mont. 423); in Indiana (Dickson v. Waldron, 135 Ind. 507); in Texas (Batterton v. State, 52 Tex. Crim. 381). Others can be found, but the above should suffice. In no State wherein a statute like ours on the question of competency exists, have we been able to find a contrary ruling, even though the words of the statute and the reason of the case may seem on but a casual view to call for a different rule. Likewise, the textbooks deduce from the adjudged cases a similar unanimous holding upon the point. [Underhill on Crim. Evidence, supra; 2 Elliott on Ev., supra; 1 Wigmore on Ev., sec. 497; 30 Am. & Eng. Ency. Law, supra; 40 Cyc. 2201; Rapalje on Witnesses, sec. 4; Chamberlayne's Best on Ev. 132; 7 Ency. of Ev. 479; 1 Greenleaf, 370; 2 Moore on

Facts, sec. 936; 4 Jones on Ev., sec. 723.] Appositely, says Wigmore, "This broad and rational principle, that the derangement, in order to disqualify, must be such as substantially negatives trustworthiness upon the subject of the testimony, is now practically everywhere accepted." [1 Wigmore on Ev., sec. 492.]

From the ruled cases we may deduce the rules: (a) That a person of unsound mind is competent as a witness, if, (1) upon examination he be found to be of sufficient mental capacity to understand the nature of an oath, that is, to know it is both a moral and a legal wrong to swear falsely, and that false swearing is a punishable crime in law, and (2) if he be possessed of sufficient mind and memory to observe, recollect and narrate the things he saw or heard; (b) that lawful confinement in an asylum for the insane, or an adjudication as an insane person, creates a prima-facie presumption of absolute incompetency as a witness; but (c) such presumption is rebuttable by the *voir dire* examination of the witness alone, or when aided by extrinsic evidence, and (d) the burden of rebutting the presumption of incompetency in case of confinement in an asylum or adjudication as an insane person is on him who offers the witness; but (e) that absent such confinement, or adjudication as an insane person, the burden of showing incompetency on account of unsoundness of mind is on him who objects on that ground.

There is nothing in the examination of witness Hoffman as to his competency which suggests incapacity. We note that he answered, "A person can make himself a meineid by speaking falsely." We are told that "meineid" is the German for "perjury" and the dictionary of that language supports our informant. The witness was compelled to use two languages to express his thought, but his understanding of the nature of an oath was good enough.

IV. Fault is found with the fourth instruction. The word "unlawfully" and the words "in the manner set out in the information" in that instruction were unnecessary, superfluous and harmless. That instruction, without those words, told the jury, in substance, that defendants had the right to use all reasonable force necessary to control Wallace, and that if the jury should find that they did unnecessarily strike, beat and injure Wallace with their feet and fists, and that Wallace died therefrom, they should find them guilty of manslaughter in the fourth degree. Thus stripped of its unnecessary and harmless words, that instruction is similar to the one approved in State v. Montgomery, 230 Mo. l. c. 666, where an officer was charged with murder and where the evidence tended to show that he used unnecessary force in resisting an effort to rescue a prisoner in his charge. It is true that where the instruction refers the jury to the information for matters which are not in the instruction and which are necessary for their consideration, such instruction is erroneous. But in this case the reference to the information performed no such function and was harmless.

*Instruction.*

Appellants say that the instruction is faulty in not telling the jury that defendants were not required to nicely gauge the amount of force necessary to subdue the patient, and that they had the right to use such force as reasonably seemed to them necessary for that purpose. The instruction is correct as far as it goes. The omission complained of is one of non-direction, not of misdirection. The appellants asked for no instruction covering that point, and have not properly brought it before the court.

Appellants say that the evidence is not sufficient to support the conviction. We cannot agree to that proposition.

The judgments against the defendants respectively are affirmed. *Williams, C.,* concurs.

PER CURIAM.—The foregoing opinion of Roy, C., is adopted as the opinion of the court. All the judges concur.