**Virginia DAVIS, Guardian of Elizabeth R. Conn, Incompetent, Respondent (Plaintiff),**

v.

**Beulah NEELY, Appellant (Defendant).**

No. 51934.

Supreme Court of Missouri, Division No. 1.

Dec. 12, 1966.

Harold Barrick, New London, William B. Spaun, Hannibal, for respondent.

J. Andy Zenge, Jr., Dennis W. Smith, Canton, for appellant.

WELBORN, Commissioner.

Action to set aside a deed and alleged gift of money. Trial court found for plaintiff on the basis of undue influence on the part of defendant. Defendant appeals.

The questioned deed was executed June 25, 1962, by Elizabeth R. Conn, conveying to her daughter, Beulah Neely, residential property located in New London, Missouri. The second transaction involved the transfer, on June 29, 1962, of $3,500 from an account in the name of Mrs. Conn in the Farmers and Merchants Bank of Hannibal to Mrs. Neely. The action to set them aside was filed November 3, 1962, by Virginia Davis, another daughter of Mrs. Conn, who had been appointed the guardian of her mother by the Ralls County Probate Court on October 29, 1962.

Mrs. Conn, a widow, was eighty-nine years old in June, 1962. Her daughter, defendant Beulah, also a widow, lived in New London. Mrs. Davis lived with her husband on a farm some four or five miles from New London. A third daughter, Mrs.

Anna Laura Batty, lived in Kansas City. A son lived in Washington, but apparently was not involved in the caring for his mother. The trial court observed that the antagonism between Mrs. Neely and Mrs. Davis bordered upon hatred. Mrs. Batty never joined either sister in the bitterness toward the other.

Since the death of her husband in 1950, Mrs. Conn had lived alone at her residence in New London. Beulah visited her often and assisted her with her housework, gardening and lawn care. Virginia visited her mother as often as she was in town, or once or twice a week. On December 22, 1960, Mrs. Conn was badly burned in a fire at her home. Mrs. Neely couldn't get her car started so Mrs. Davis was notified of her mother's injuries and she took her mother to a hospital in Hannibal. Mrs. Neely had done practical nursing and assisted in the care of her mother during her hospitalization. Mrs. Batty came to Hannibal and also assisted. On January 17, 1961, at Mrs. Neely's suggestion, Mrs. Conn was transferred to a hospital in Quincy, Illinois. Mrs. Davis said that she "went up there a couple or three times to see her." Mrs. Conn was released from the hospital on February 26, 1961. Mrs. Neely and Mrs. Batty took their mother to Mrs. Neely's place of residence in New London. On March 31, 1961, Mrs. Conn was again hospitalized in Quincy because of the burn injuries. She was released April 7, 1961, and Mrs. Batty brought her to Mrs. Davis's residence. Mrs. Batty remained at the Davis residence with her mother until May 2, 1961.

Mrs. Conn remained with Mrs. Davis until the last week of April, 1962. Around that time, arrangements were made for Mrs. Conn to go to a rest home in Hannibal. She was at Mrs. Neely's for about one week before going to the rest home on May 1, 1962. On June 17, 1962, Mrs. Neely removed Mrs. Conn from the rest home and took her back to New London. Mrs. Conn spent the night at Mrs. Neely's, but during the day she was at her own residence and Mrs. Neely brought her noon meal to her.

On October 1, 1962, Mrs. Batty returned to New London. After learning of the transactions here in question, Mrs. Batty took Mrs. Conn to her home in Kansas City. On around October 21, 1962, Mrs. Conn returned to Mrs. Davis's home and remained there until the time of the trial.

Prior to her injury in December, 1960, Mrs. Conn had a checking account in the Farmers and Merchants Bank of Hannibal. She maintained a balance averaging in the vicinity of $4,000.00. The expenses of her hospitalization were paid from the account. On April 17, 1961, the account was changed to a joint account with Mrs. Batty, with either authorized to draw checks on the account. Mrs. Conn also had a $5,000 certificate of deposit with Citizens Discount Co. of Hannibal. That company would not place the account in joint names. By arrangement made by Mrs. Davis, the account there was, around May, 1961, placed in the name of Mrs. Batty. According to Mrs. Batty, the accounts were so changed in order to permit someone to be in a position to take care of her mother in the event that her mother was in no position to do so. Mrs. Neely, according to Mrs. Batty, approved the arrangements. Thereafter, Mrs. Batty signed checks for her mother's expenses, including the charge for nursing home care. The interest income from the Citizens Discount Certificate was deposited in the Conn-Batty account.

Mrs. Conn had a dog "Trixie" of which she was very fond. One consideration in the choice of the nursing home to which Mrs. Conn was taken was that she was permitted to have the dog with her. By an almost undecipherable post card, dated June 13, 1962, Mrs. Conn informed Mrs. Neely that "Virge (Mrs. Davis) and Grace (Conn) come and got Trix." Mrs. Neely went to the rest home on June 15, and after an altercation in which the proprietress struck her mother (accidentally, according to Mrs. Conn—the blow was intended for

Mrs. Neely) and which required police intervention, Mrs. Neely returned Mrs. Conn to New London. Mrs. Conn spent the days at her residence with Trixie, who was found at the Davis residence, and her nights at Mrs. Neely's.

The major portion of the testimony concerning the June 25th and 29th transactions came from Mrs. Neely. According to Mrs. Neely, her mother had frequently told her that the place in New London was rightfully Beulah's because her husband had lent her father $300 toward its purchase price and it was never repaid. After she returned from the nursing home, Mrs. Conn said: "Beulah, you have done more for me than all the rest of them, and I want you to have that place back." On Sunday she said to Beulah, "I left my safe deposit box at Ann Croll's, and I want to go over there and get that box." Beulah took her mother to Mrs. Croll's that afternoon. Her mother told Ann, "Ann, I left my box here, and I would like to have it." "Ann went and got it and * * * set it in her lap, with those band-aids still on her face, [my mother] looked up at her and she said, 'Ann,' she said, 'Virge is back of all of this,' says, 'that's the meanest ——————— * * * that ever walked on two feet.'"

Mrs. Davis had testified that, when she took her mother to the hospital at Hannibal in December, 1960, her mother asked that she get her lockbox and take it to Mrs. Croll's. Mrs. Davis did so en route to the hospital. Mrs. Davis subsequently removed the Citizens Discount Certificate from the box while it was in Mrs. Croll's custody. Mrs. Conn's husband was Mrs. Croll's half brother. According to Mrs. Croll, Mrs. Davis and Mrs. Conn came by her house after the fire and brought a metal box "like most women keep their papers in * * *." She described its return to Mrs. Conn as follows: "Mrs. Falk, my sister, was here and [Mrs. Conn and Mrs. Neely] came to see my sister. When they got ready to go home, Beulah said to her mother: 'Mother, are you going to ask what you came for?' She said: 'What did I come

for?' and Beulah said: 'That box.' I asked Lizzie: 'Do you want your box,' and she said: 'I guess I do.'"

According to Beulah, when she and her mother got home with the box, they were unable to locate a key for the padlock with which it was locked. Her mother said: "I'm going to get in this box * * * Have you got a hacksaw?" Beulah had such a tool and laid it on the table for her mother. "She sawed, and sawed on it. Her little hands weren't any wider than my three fingers and she was handling that hacksaw. I was canning out back and as I came through into the kitchen she said, 'Come here a minute.' I went and she said, 'Give me a little lift on this,' and just to please her, I said, 'all right,' and I picked it up and sawed about two or three saws and laid it down, and when I came in she had it all off."

According to Beulah, her mother noticed that the Citizens Discount Certificate was missing and remarked that she had endorsed it to Mrs. Batty. She said: "Beulah, I'm climbing the ladder * * * I'm really getting up in years * * * If you don't get anything before I die, you will never get a dollar after I die and I want to fix this thing. * * * I want to make you a deed to that house that rightfully you gave us." "There's no old deeds in the box * * * You will have to get the description off the abstract." She gave Beulah the abstract and from it Beulah obtained the description to the property which was used in the deed that she prepared.

Before preparing the deed, Beulah, in order to satisfy herself of her mother's mental capacity, although she herself knew there was nothing wrong with her mentally, had her mother examined by Doctor Lankford at Mexico. On June 25, 1962, Doctor Lankford examined Mrs. Conn for a urinary tract infection and, according to Doctor Lankford, "her daughter at the time questioned me as to her sensorium or rationale, so I quizzed her as to her knowledge of time, place and person, recent

events, past events." The doctor found her oriented as to time, place and person and was of the opinion that she would have understood a deed transaction at that time.

On their return to New London, Beulah prepared the deed from her mother to her and also a certificate of delivery of the deed from the grantor to the grantee.

On June 26, Mrs. Roberta Blackwell, a notary public, went, in response to a call from Beulah, to Beulah's apartment, where she saw Mrs. Conn sign the deed and took her acknowledgment. Mrs. Blackwell said that she had known Mrs. Conn for several years, and that she visited with her on this occasion a few minutes. Then Mrs. Neely asked her if she was ready to sign, or words to that effect, and she said, "yes." Mrs. Blackwell said that she had no conversation with Mrs. Conn concerning the nature of the instrument and that she (Mrs. Blackwell) did not know what it was. The only comment by Mrs. Conn which Mrs. Blackwell recalled was "It's Hell when your kids fight all the time."

The deed recited a consideration of $1.00 and other good and valuable considerations. When Beulah was asked whether or not she paid any consideration, she replied: "Well, I throwed down a couple or three dollars, whatever it was." She said that she did so because her mother said, "You better put a revenue stamp on there to indicate a consideration." She said that her mother also said, "Beulah, try not to have that recorded for a while, at least, maybe until I am gone. * * * When that sister finds it out, she is going to start raising the devil." Acceding to her mother's request, Beulah did not record the deed until October 27, 1962.

As for the $3,500, Beulah testified that her mother was unhappy with Mrs. Davis because she had been inquiring at the bank about the status of Mrs. Conn's account. Beulah went to the bank to find out who was giving Mrs. Davis information. When she returned and told her mother what she learned, her mother said: "Well, you pay everything anyway and I am going to make you a gift, you have been good to me, you have taken me through these hard sick spells * * * I want you to have the rest of what I've got."

On June 29, 1962, Beulah and her mother went to the bank. Beulah inquired about the balance in the account, which was $3,975.51. Her mother told her to leave a little in the account to pay her Blue Cross and Blue Shield. Beulah and a bank employee made out a check payable to Mrs. Conn for $3,500.00. Her mother turned it over and endorsed it and said: "Now this is yours." Beulah deposited the check in a savings account which she opened in her name.

Mrs. Batty returned to New London on October 1, 1962. She asked Mrs. Neely about the balance in their mother's bank account. When she was told that it was around $300, she asked what had happened to the remainder and Mrs. Neely said, "It's safe." Mrs. Batty had a "few words" with Mrs. Neely. According to Mrs. Batty, they had a "few more words" a day or two later and Mrs. Neely said, "I was a damn fool if I didn't keep what I had." Mrs. Neely denied having made such a statement. When Mrs. Batty left New London about October 8, she took her mother with her. Around October 21, she returned with her mother to New London when she went to stay with Mrs. Davis. The guardianship proceedings began shortly afterward, without the knowledge of Mrs. Neely.

The trial court, in reaching its conclusion that the transfers were the result of undue influence of Mrs. Neely obviously placed little stock in the credibility of Mrs. Neely's version of the events. The recital of her testimony is sufficient to lead us to the same conclusion.

The trial court did give considerable weight to the testimony, by deposition, of Mrs. Conn. On this appeal, appellant contends that the court erroneously considered Mrs. Conn's deposition because she had in-

sufficient mental capacity to testify. When objection was raised to Mrs. Conn's capacity to give a deposition, the trial court, on December 29, 1962, conducted a voir dire examination of the witness and concluded that the objection of the defendant to Mrs. Conn giving her deposition should be overruled. Mrs. Conn's deposition was not completed until November 14, 1963. At the trial, the court overruled the objection to the introduction of the testimony given by Mrs. Conn on the deposition. The trial court ruled that, despite the provision of § 491.060(1), RSMo 1959, V.A.M.S., the adjudication that Mrs. Conn was incompetent created "only a prima facie presumption of incompetency to testify as a witness which is rebuttable by voir dire examination or otherwise. Beil v. Gaertner [335 Mo. 617], 197 S.W. (2) 611; State v. Brown [360 Mo. 104], 227 S.W. (2) 646; and State v. Herring, 188 S.W. 169, 268 Mo. 514." The court found, on the basis of the voir dire examination and the answers that Mrs. Conn gave on her deposition, that she was "of sufficient mental capacity to know the nature of an oath and to have a sufficient memory to recall and tell the things * * * she saw and heard."

Appellant does not question the trial court's statement of the applicable law, but contends that the answers given by Mrs. Conn on her deposition amply indicate that her mental condition had so deteriorated at the time of giving the deposition that she was unable to give competent testimony.

Our examination of Mrs. Conn's deposition reveals some confusion on her part on her cross-examination by counsel then representing defendant. Her testimony does show that she was aware that she had an account at the Farmers and Merchants Bank and that her husband had left her property in New London. She was aware that the money in the bank account was used to take care of her needs, and that, as Beulah testified, Beulah would get money on checks which Mrs. Conn wrote.

She testified correctly that she was at the nursing home about a month, "maybe a little longer." She recalled the altercation with the proprietress on her departure. Mrs. Conn was obviously confused two occasions when she was at the bank with Beulah. She kept referring to an occasion, apparently when the acount was opened. However, she was undoubtedly there when the $3,500 was transferred to Beulah. All in all, we do not find such absence of capacity, on the part of Mrs. Conn, as would cause her testimony to be rejected. We consider it of significance in showing the dealings with Beulah on the transaction in question. We note the following from her deposition:

"Q. Do you remember going to the Farmers and Merchants Bank with your daughter, Mrs. Neely? A. Yes.

"Q. Did you sign any papers at the bank? A. Yes.

"Q. Who told you to sign them? A. She told me to sign here.

"Q. Who was 'she'? A. Beulah.

"Q. Did you know you were signing your bank account over to her? A. No, sir. I wouldn't sign my bank account to anybody.

"Q. Did you sign your home over to Beulah Neely? A. No, sir. No, sir. I never signed it over to her.

"Q. What did Mrs. Neely tell you when you signed the paper? A. She just said 'sign this paper, Mom' then the paper was folded so I couldn't see anything else but just where I was to write, than to write my name. There was nobody in there when I signed the paper.

"Q. Did you trust your daughter, Beulah Neely? A. Well, I always had.

"Q. Was she good to you? A. Yes, she was pretty good to me. All of them

get mad at you at times. I guess I am aggravating sometimes.

"Q. Did you know you signed a deed to your home property to Beulah? A. No, not until I heard people talking about it. It was in the papers they said. I got the Hannibal paper.

"Q. Did you see it in the Hannibal paper? A. Yes, after I was told about it.

"Q. Did you mean to deed her your property at any time? A. No indeed.

\* \* \* \* \* \*

"A. If I signed a paper to give my money away I didn't know it. I never looked at them.

\* \* \* \* \* \*

"Q. Did you want Beulah to have your money in your bank account? A. Get my money?

"Q. Did you want her to have your money? A. No, I didn't want her to keep my money. I wanted to put it in the bank.

"Q. Did you want her to have your house? A. No, I wanted my house, but she took it away from me.

"Q. You want your home back, do you? A. Yes.

"Q. Do you want your money back? A. Yes, because I've got no money to live on.

"Q. You have always trusted Beulah? A. I always had before."

We think this testimony, together with the obvious situation of the parties and Beulah's unconvincing version of the transactions, shows that the transactions were the product of Beulah's undue influence. We agree with the trial court's assessment of the situation:

"When all the evidence is considered— the age of Mrs. Conn, the amount of her real property and personal property, the physical and mental condition of Mrs. Conn, the natural objects of her bounty, the preparation of the deed and certificate of delivery by Mrs. Neely, the taking her mother to the Mexico doctor to have him consider the mental competency of Mrs. Conn the very day the warranty deed was dated, the fact that Mrs. Neely actively participated in both the execution of the deed and the transfer of the money in the bank, the testimony of Mrs. Conn that she never intended to convey her real estate or to give the $3,500.00 to Mrs. Neely, the circumstance of Mrs. Neely's delayed recordation of the deed, her having failed to advise either of her sisters of the conveyance of the mother's home or transfer of the bank funds, the fact that at other times Mrs. Conn had Mrs. Neely get small amounts of money from the bank for her and that on the bank visit June 29, 1962, Mrs. Conn believed that that was what Mrs. Neely was doing for her and that Mrs. Conn did not know that she was transferring to said daughter all her money in the bank except about $375.00, Mrs. Neely's retaining the $3,500.00 in cash in her home since the latter part of October, 1962, all these facts and circumstances in combination require me to find the issues for the plaintiff herein."

See Manahan v. Manahan, Mo.Sup., 52 S.W.2d 825; Dimity v. Dimity, Mo.Sup., 62 S.W.2d 859; Bohnsack v. Hanebrink, Mo.Sup., 240 S.W.2d 903.

The judgment is affirmed.

HOUSER and HIGGINS, CC., concur.

PER CURIAM.

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

HENLEY and HYDE, JJ., and STORCKMAN, Alt. J., concur.

HOLMAN, P. J., not sitting.