STATE of Missouri,
Plaintiff-Respondent,

v.

James Richard RUSSELL,
Defendant-Appellant.

No. 11010.

Missouri Court of Appeals,
Southern District,
Division Three.

April 27, 1979.

John D. Ashcroft, Atty. Gen., Paul Robert Otto, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Daniel T. Moore, Poplar Bluff, for defendant-appellant.

GREENE, Judge.

Defendant was charged, by information filed on March 7, 1977, in Butler County, Missouri, with one count of forcible rape and one count of sodomy. Subsequently, the information was amended to charge defendant with those offenses under the Second Offender Act, § 556.280 RSMo 1969, V.A.M.S. The court, after hearing, found the defendant to be a second offender, since he had a prior felony conviction. The case was tried before a jury in Butler County on February 21, 1978, and the jury returned a verdict of guilty on both counts. Defendant timely filed a motion for new trial, which was overruled by the trial court. The trial court then entered its judgment and sentenced defendant to 20 years for rape on Count I, and 15 years for sodomy on Count II, with the sentences to run concurrently.

Defendant then appealed. His sole point, preserved for review, is that the state's evidence was not sufficient to sustain a conviction for the reason that the evidence

presented by the prosecuting witness, Sally Ann Harris, was not convincing, was contradictory in nature, was unbelievable, was in conflict with the testimony of other witnesses, and was contrary to common experience, and that, therefore, her testimony, by reason of law, needed to be corroborated. Defendant further contends that since the testimony of prosecutrix was not corroborated, the evidence was insufficient to sustain his conviction on either count.

■ At the trial, defendant offered evidence in his own behalf, after the court had overruled his motions for judgment of acquittal on both counts, which he had filed at the close of the state's case. He did not file motions for judgment of acquittal at the close of all of the evidence and, therefore, has waived the objection that he raises on appeal as to the insufficiency of the evidence. *Myers v. United States*, 337 F.2d 22, 23 (8th Cir. 1964); *State v. Brown*, 554 S.W.2d 574, 580 (Mo.App.1977). However, we exercise our right to review defendant's contentions under the plain error doctrine, rule 27.20(c), V.A.M.R., as it would have been plain error to submit the case to the jury if the evidence was not sufficient to sustain the convictions. *State v. White*, 439 S.W.2d 752, 753 (Mo.1969). A review of the evidence is therefore necessary.

Sally Ann Harris, the prosecutrix, hereinafter referred to as Sally, testified that she was 18 years old at the time of the alleged crimes. She was a college student at Three Rivers Junior College, and was studying to be a dental assistant. On the evening of January 29, 1977, she and a girlfriend, Paula Allen, went to the Sunset House, a cocktail lounge in Poplar Bluff. They arrived a little after 9 p.m. Defendant was also at the Sunset House. Sally had not known him prior to that time. He asked both girls to dance, and both girls danced with him. Sally drank two or three beers while there, one of which was purchased by defendant. The girls left the Sunset House, and went to the Tijuana Lounge, where they saw the defendant again. Sally had not asked him to meet them at the Tijuana, but Paula may have done so. The Tijuana was closing when the girls walked in, the time being about 1 a.m., on January 30th. Defendant asked the girls if they wanted to go to the Eagles Club, and they said yes. Sally, Paula and defendant then proceeded to the Eagles Club.

The club is a two room structure. One room contains the bar and the other, referred to as the back room, contains a bandstand, tables and a dance floor. The two rooms are connected by a door. The girls and defendant went to a table in the back room. There were 20 to 25 people in the back room at that time who were drinking and listening to the band. Sally drank a bourbon and coke. The band played for a few minutes, and then quit for the evening. Sally, Paula, defendant and another man were sitting at a table. Defendant suggested sexual intercourse to Sally and she said no. Paula, the other man at the table and all of the other people, except for Sally and defendant, left the room. Sally then got up to leave. Defendant was still talking to her about sex. He then grabbed her by the arms, pushed her to the floor, got on top of her and said, "If you move I'll kill you". Her glasses fell off when she hit the floor.

Defendant dragged Sally by the hair and arms to the storeroom, a small room adjacent to the back room which they were in. Defendant had one hand on her throat. She was pushing, kicking and trying to get away. Defendant pushed her to her knees and forced her mouth over his penis. He then made her lie down on the floor and forced her to take her pantyhose and panties off. At this time, he was also choking her. She tried to yell but could not because of the choking. Defendant then raped her by penetrating her private parts with his penis by the use of force. At this time, she was in fear for her life, because of his threats to kill her if she did not submit. During the rape, he continued his threats to kill her, and struck her on the back of the head and in the back. She continued to kick him and to struggle, but to no avail. When defendant was finished, he told her to stay where she was or he would kill her. Defendant then left the room. When Sally

was thrown on her back in the storeroom, she felt her back become wet and she smelled beer. She did not know whether or not the defendant ejaculated during the intercourse.

When defendant left the room, Sally put on her underthings, went to the front room and asked the bartender to let her out of the club, since the door was locked. She did not say anything else to the bartender. The next thing she remembered she was at the police station. She was taken to the hospital where she was given a pelvic examination by a doctor, and then taken back to the police station where she gave a tape recorded statement. On cross-examination, she testified that she had not been in Vic's Lounge that evening, that she did not know how long she had been in the Eagles Club that evening before the assault, that she yelled and screamed when defendant was trying to drag her back to the storeroom and that defendant continued to threaten her and choke her during most of the time of the assault. She remembered telling the police that she had been raped when she got to the police station, but did not tell them about the sodomy until a later time. She had not had sexual intercourse with anyone for two days prior to the day in question. She was never beaten on the face but was hit on the head by defendant. Nothing that prosecutrix testified to on cross-examination contradicted, in any way, her direct testimony on any significant issue.

Other relevant evidence received, as part of the state's case in chief, was as follows. George Prince testified that he was a Poplar Bluff police officer, and that he saw Sally Harris at about 3 a. m. on January 30, 1977, sitting on a bench at City Hall. Loyd DeCourley and a female companion were with her. Sally's clothes were "mussed", she was tearful, incoherent and hysterical. She kept saying, "Why me?" It took Officer Prince at least 15 minutes to calm Sally down before she was taken to the hospital. When the officer received her clothes from the hospital emergency room, the clothes were damp and had a strong odor of beer on them.

After they returned from the hospital, Officer Prince interviewed Sally. Because of her emotional state, he could not obtain a written statement. Her eyes were red and bloodshot, she was crying, she was very nervous and hysterical, and, at times, she was incoherent. She was unsteady on her feet. She identified a Jim Russell, which is the name of the defendant, as the person who had raped her. Her hair was mussed up, and he did not believe Sally to be intoxicated.

Thomas Pruett testified that he was a Poplar Bluff police officer. He saw Sally about 3 a. m. on January 30, 1977. She was in the hallway at the police station. She was hysterical, hard to understand, and her clothing was disarrayed. Her skirt was wrinkled and a button was undone on her blouse. She kept repeating, "Why, why" or "Why me?". The back of her clothing was wet and her hair was "mussed up". Sally had three red marks on the right side of her neck. In his opinion, Sally was not intoxicated.

Dr. Briner, the chief chemist at the Regional Crime Laboratory in Cape Girardeau, testified that, by means of laboratory examination, a high concentration of acid phosphatase and coline, two components of male seminal fluid, was found in the crotch area of Sally's panties. The examination was made about 8 a. m. on January 31, 1977. Dr. Briner also testified that the chemical elements found indicated that intercourse had, or may have taken place, but that ejaculation certainly had taken place. He did not find any male sperm in his examination of Sally's clothing, but said that the absence of sperm was not an unusual finding in such cases. The testimony referred to above constituted the relevant evidence in the state's case in chief.

The substance of defendant's evidence was as follows. Dr. Turner, a physician, saw Sally at the hospital at 3:21 a. m. on January 30, 1977. She stated to him that she had been raped. He examined her and found no evidence of bruises on her body or face. She did not tell him that she had been a victim of sodomy. He said it was

possible to get red marks on your throat, if someone gripped it, without getting bruises as a result.

Dr. Richard Ramirez, a pathologist at the hospital, made a sperm test from a sample taken from the vagina of Sally, and did not find any sperm. He did not test for acid phosphatase.

Cletus Guard, Jr. was in the Eagles Club on the night in question. He left the club about 3 a. m. There were about ten people in the club when he left. He saw defendant on that night. Defendant came in with two ladies and went to the back room, where they sat down at a table. One of the young ladies left the club before defendant, and she was "kinda nervous about getting out". Defendant then went to the rest-room, came to the bar, got a drink, and left the building. Guard did not hear any screaming or commotion from the back room. People were still in the club when defendant left. Guard admitted that you could not hear someone "holler" in the back room if you were in the front, or bar room.

Harry Allen was the bartender at the club. He saw defendant with two girls on the night in question. They were sitting in the back room. The band quit playing about 1:30 to 2:00 a. m. When the band quit, 15 to 20 people were still in the club. He did not hear any fight or commotion from the back room. He saw both girls leave. The first girl left with several people. The second girl left by herself about 30 minutes later. Defendant was still at the club and left later. Allen did not go into the back room in the period of time between when the first girl left the premises and when the second girl left.

Ricky Guard was at the Eagles Club between 8 p. m. and 2:30 or 3 a. m. He did not hear any screaming or commotion from the back room that night. He let Sally out of the building. Sally was pulling her hair after she got out of the building. He had told the police that Sally was upset when she left, but changed his story at the time of trial. He said he did not believe in telling police officers the truth.

Loyd DeCourley was the last witness for the defendant. At the time of trial, he was a Butler County deputy sheriff. On the night in question, he was an employee of the Poplar Bluff Police Department. He first saw Sally at about 10:30 p. m. on the night in question. She was in the Tijuana. She was drinking what appeared to be beer. He saw her a few minutes later at Vic's which is just south of the Tijuana. He saw her later that evening at a time he thought was about 2 a. m. He had just gone off duty and had gone to the police station to get his car to go home. He heard a shrieking, screaming sound, looked across Broadway, and saw a young lady fall. He went to her aid. It was Sally, and she was hysterical. He picked her up and carried her into the station. Her face was "tear stricken". She was very spastic, was incoherent and was shrieking. She said something about the Eagles Club and about being raped. He did not know if Sally was drunk or not. Sally told DeCourley, and other officers at the station, who had raped her. His testimony concluded the relevant evidence for the defendant.

Defendant, in his argument, contends that since prosecutrix had consumed three bottles of beer and a mixed drink during the evening in question, was unsteady on her feet and had red, bloodshot eyes when questioned by the police after the alleged attack, that since she continued to struggle and scream after being told by defendant that he would kill her if she did not submit, and that since no spermatozoa were found on her clothing or in her vaginal canal, that her testimony regarding the rape and sodomy was contradictory and unconvincing and, therefore, needed corroboration. We disagree. There was no direct testimony in the case that prosecutrix was intoxicated, from which the jury might infer that her powers of recollection were faulty. In addition, several witnesses stated that, in their opinion, she was not intoxicated after the alleged attack. Her red, bloodshot eyes and unsteady gait were just as consistent with hysteria and prolonged crying as they were with drunkenness. As to the absence of sperm, Dr. Briner testified that the lack of

sperm on the victim's clothing was not unusual in cases of this type. Also, Dr. Turner testified that there are certain conditions under which a male, by ejaculation, would produce acid phosphatase in the seminal fluid, but would not produce sperm, as, for instance, in a case where the male had undergone a vasectomy procedure. Defendant finally asserts that, because Sally continued to struggle and scream after being told she would be killed if she did not submit, her testimony was therefore unbelievable. We deem it not contrary to common experience for a woman, in a struggle to protect the privacy of her body from the forced intrusion of a would-be rapist, to struggle and cry out, even though she had been threatened with bodily harm if she did not submit.

The crime of forcible rape, as alleged in Count I of the information, made it incumbent upon the state to prove the essential elements of carnal knowledge by force, and against the will of the prosecutrix. *State v. Garrett*, 494 S.W.2d 336, 338 (Mo.1973). As to Count II, the state merely had to prove that the act of sodomy occurred, as lack of consent is not an issue. *State v. Pfeiffer*, 277 Mo. 202, 212, 209 S.W. 925, 928 (1918). In deciding whether or not the evidence is sufficient to sustain a conviction in rape and other sexually oriented cases such as sodomy, the rule is that corroboration of the testimony of the prosecutrix is not required, unless her testimony is contradictory and in conflict with physical facts, surrounding circumstances, and common experience to such an extent that its validity is doubtful. *State v. Wood*, 355 Mo. 1008, 1012, 199 S.W.2d 396, 398 (1947); *State v. Bursley*, 548 S.W.2d 586, 588–589 (Mo.App.1976). It is clear, from the evidence in this case, that the testimony of the prosecutrix, standing alone, made a submissible case for the jury. Her testimony was not contradictory or in conflict, in any significant aspect, with other testimony, physical facts, or surrounding circumstances. It was not contrary to common experience, and therefore, was not required to be corroborated. *State v. Tripp*, 558 S.W.2d 809, 810 (Mo.App.1977).

In addition, the corroboration rule, which has been criticized in Missouri as an "exception to the general rules governing appellate review", *State v. Platt*, 496 S.W.2d 878, 880 (Mo.App.1973), but which is still the law, as it has not been rejected by the supreme court of this state, *State v. Neal*, 484 S.W.2d 270, 272 (Mo.1972), has no place here as the testimony of the prosecutrix was amply corroborated by other witnesses. Without belaboring the point, there was substantial evidence from several witnesses that Sally, soon after she left the Eagles Club was incoherent, hysterical and crying. She had red marks on her throat, and her clothes were in disarray. Her clothes were damp and smelling of beer, which corroborated her testimony that she was thrown on her back in some spilled beer when she was raped. She told the police she had been raped as soon as she was asked what was the matter with her and told them later that she had also been sodomized. She kept repeating "Why?" and "Why me?". Her panties contained substantial amounts of chemical substances found in male seminal fluid. It is difficult to conceive what stronger corroborating evidence could have been presented to the jury.

Since we find that the testimony of the prosecutrix was clear and convincing, not contradictory, and not in conflict with the physical facts, surrounding circumstances, and common experience, and, in addition, since we find that her testimony was amply corroborated, there is no need to set out and distinguish those cases cited by defendant in his brief, as all of them deal with situations where the testimony of the prosecutrix was patently confusing and contradictory, and where there was no corroboration.

It was the function and duty of the jury to hear the evidence, and to give it such weight and value as they thought it deserved, to determine the credibility of the witnesses, and to render such verdicts as they thought proper, based on the evidence and the instructions of the court. The jury here has done so. In our view, this court should only determine if there was substan-

tial evidence to support the verdicts of guilty that the jury returned. *State v. Talbert,* 454 S.W.2d 1, 4 (Mo.1970).

After a careful examination of the record, we conclude that there was substantial evidence to support the findings of the jury, and therefore, their verdicts of guilty on both counts of the information should not be disturbed.

The judgment of the trial court is affirmed.

FLANIGAN, C. J., and BILLINGS and MAUS, JJ., concur.