STATE of Missouri, Respondent,

v.

Jerry DIGHERA, Appellant.

No. WD 31261.

Missouri Court of Appeals,
Western District.

May 4, 1981.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 2, 1981.

Application to Transfer Denied
July 14, 1981.

**526**

Clifford A. Cohen, Public Defender, Gary L. Gardner, Asst. Public Defender, Kansas City, for appellant.

John Ashcroft, Atty. Gen., Jefferson City, Darrell Panethiere, Asst. Atty. Gen., Kansas City, for respondent.

Before KENNEDY, P. J., and SHANGLER and SOMERVILLE, JJ.

SHANGLER, Judge.

The defendant Dighera was convicted of the rape and the sodomy of S.D., a deaf, mute and blind female twenty years of age. The defendant was sentenced to serve fifteen-year concurrent terms on the convictions.

The defendant brought a motion in limine to exclude as incompetent the testimony of prosecutrix S.D. on the grounds that, at the time of trial, she was confined to the Western Missouri Mental Health Center under order of the court and that S.D. was otherwise disabled as a witness by inability to see, hear or speak. The trial court heard evidence on the motion, denied remedy, allowed the testimony of the prosecutrix, and the defendant appeals.

 The text of § 491.060 renders a person of unsound mind incompetent to testify. The effect of the statute is to create the prima facie presumption that a person confined to a mental institution under lawful process or adjudicated as mentally ill is absolutely incompetent as a witness. *State v. Herring*, 268 Mo. 514, 188 S.W. 169, 174[5–8] (1916). The presumption may be overcome, however, by extrinsic evidence that the witness understands the obligation of the oath, has sufficient mind and memory to notice, recollect and communicate the events. *State v. McCarty*, 460 S.W.2d 630, 637[5, 6] (Mo.1970). The burden to rebut the presumption of incompetency of one confined or adjudicated mentally ill by process of law rests on the party who offers the witness. *State v. Herring*, supra, l. c. 174[5–8]. The determination whether the presumption has given way to evidence of competency rests with the trial court, and that decision will be sustained unless an abuse of discretion appears. *State v. Burnfin*, 560 S.W.2d 283, 284[4–6] (Mo.App.1978).

 The determination that S.D. was competent to testify rests on the effect of

composite Exhibit 1, a packet of official records kept by Western Missouri Mental Health Center on S.D. during the confinement, received in evidence on the pretrial motion to exclude the prosecutrix as a witness. Those records show that S.D., a juvenile [then twenty years of age] had been under the jurisdiction of the Boone County Court since age five.[1] On April 4, 1979 [2] she was required by the owner to leave Rockhill Manor where she lived and so was taken by the police, drunk and distraught, to the Western Missouri Mental Health Center at the instance of the Jackson County Division of Family Services. Within days, the Juvenile Court of Boone County ratified the placement by an order that S.D. was "in need of protection" and the direction that the Division of Family Services place S.D. with a mental health facility. [The record entry of that facility shows, however, that S.D. was admitted under her signature as voluntary patient under § 202.-115.]. The replete records show that, whether by voluntary admission or formal order of law, there was ample evidence for the trier of fact to find that S.D. was received, not to treat for a mental illness, but to provide her a shelter.[3]

■ The psychological evaluation record in evidence shows S.D. as of "high average to bright normal intelligence [IQ 105–119]" and a reading skill by fingerspelling [by which she communicated] at the "sixth to seventh grade" level. Other entries by the psychologist describe her language patterns as "near normal . . . conversation with her is easy and ideas can be exchanged freely."

These aptitudes were appraised as "sophisticated language skills compared to most persons deaf-blinded early in life." This evidence sufficed for an adjudication that S.D. had sufficient mind and memory to notice, recollect and communicate the events on which she was examined—and hence her competency as a witness. *State v. Herring*, supra, l.c. 174[5–8]; *State v. McCarty*, supra, 637[5, 6]. The internment at a mental health facility was a factor to disparage her competency, but only presumptively. The other extrinsic evidence was sufficient to overcome that presumption and to allow the trier of fact to draw the inference of competency to testify. *State v. Simerly*, 463 S.W.2d 846, 848[3] (Mo.1971). That the witness was bereft of sound, speech and sight did not affect her competency as a witness, when she was able to communicate by fingerspelling language through an interpreter and otherwise had capacity to notice, recollect and communicate the events in controversy. *Kley v. Abell*, 483 S.W.2d 625, 627[4–6] (Mo.App.1972); *State v. Smith*, 203 Mo. 695, 102 S.W. 526, 527 (1907).

■ The defendant contends, nevertheless, that the proper course for the determination of competency was the presentation of the witness for voir dire examination rather than for the determination to rest on the institutional records of the mental health facility. We agree that better practice suggests that the person tendered as a witness be produced to the court in advance of trial for that preliminary inquiry. *State v. Pierson*, 337 Mo. 475, 85 S.W.2d 48, 53[6]

---

1. The Social History Information entry shows that S.D. was born with normal sensory function, but at about age 5, she was run over by a truck and suffered a fractured skull and lost her sight. She then contracted meningitis and, as a result of lack of parental care and concern, she lost her hearing. The juvenile court assumed jurisdiction over her person and placed her in the custody of the Division of Family Services. Thereafter, she was placed in a special school for the blind in Massachusetts and with numerous foster parents. Her multiple disabilities require unique facilities and render a permanent placement difficult.

2. S.D. was offered as a witness on May 9, 1979, the date of the trial, about a month after admit-

tance to the Western Missouri Mental Health Center.

3. The records entries describe a tendency by S.D. to self-mutilation, habitual consumption of alcohol, violence, sexual promiscuity, want of sound judgment, and the impulse to vent anger when frustrated. These are evaluated by the examiners, and other experts as symptoms of psychological disturbance—largely engendered by her physical state—and not psychosis or other mental illness. The records show also that at the time S.D. was received at the facility, she was pregnant with child, and much of the regimen during that internment was to nourish her for that condition and otherwise prepare her for the eventual birth of the child.

(1935); *State v. Herring*, supra, l.c. 174[5–8]. The witness was produced at the trial, however, and the defendant does not contend that any episode or response elicited from her impugned the competency of her testimony. The decision of the trial court to allow testimony from S.D. as a competent witness was not an abuse of discretion.

The defendant contends next that the evidence was not sufficient to sustain guilt on either the rape or sodomy charges and so required judgments of acquittal. The more exact contention, as to the rape conviction, is that the testimony of the prosecutrix was so inherently contradictory and so in conflict with the other evidence as to require corroboration, and in the absence of that validation, the verdict of guilt was without substantial basis.

The unlawful sexual encounters with S.D. alleged against the defendant Dighera were at two sites: the Wrenmoor Apartments and premises privately owned by one Fry. The prosecutrix S.D. was at the time a resident at the Wrenmoor under the supervision of one Eiltz, a functionary with the Center for the Development of the Disabled. The defendant Dighera was the manager of the Wrenmoor Apartments. The prosecutrix S.D. had performed sexual acts with Dighera on at least one prior occasion. S.D. was also intimate with Ryan, her boyfriend, and father of the child she carried. They planned to marry, [Ryan was a convicted felon and described as a borderline mentally defective.] S.D. and Ryan quarrelled over Dighera on January 28, 1979, but settled that matter of jealousy by an agreement to refer the concern to counsellor Eiltz. Ryan also expressed to her his displeasure at her inclination to linger in the lobby of the apartment building and so [presumably] attract male attention. Ryan confronted Dighera some six times and warned him to discontinue his advances to S.D. and not to offer her alcoholic drink any more.

Thereafter, on the evening of January 28, 1979, Dighera and Fry encountered S.D. in the lobby of the apartment building. They requested her to accompany them, and after she fetched her coat from her apartment, Dighera drove them to the Fry residence and then to the Dighera apartment. Sexual activity among the three ensued at the Fry premises and, thereafter, S.D. slept together with Dighera on the floor of his apartment. The defendant Dighera gave S.D. a drink of bourbon whiskey, which she consumed without pause, and thereafter drank some ten beers. The defendant admitted the sexual intercourse, but contended the activity was consensual and not compelled. S.D. testified she was drunk at the time and was otherwise coerced to the acts. The next morning, Dighera put S.D. in a taxicab from the Fry residence for delivery to her home. The cab driver recalled that Dighera escorted S.D. over the snow and ice to the cab as he held her hand—which she was reluctant to release. In the interim, both boyfriend Ryan and counsellor Eiltz became apprehensive when S.D. did not return to the apartment the night of January 28th, and reported her as missing to the police department. Thus, it happened that Ryan, Eiltz and a police officer were present at the apartment when S.D. returned at nine o'clock the next morning. She appeared distraught and exhausted, but not dishevelled, and after some communication with the officer through Ryan, S.D. was taken to a hospital for examination. Her body bore some bruises.

In the course of investigation, Dighera was taken in arrest on charges of rape and sodomy. At first he represented himself to the officer as Ken Reed, but then admitted his true identity. He admitted sexual relations with the prosecutrix at two different locations on the evening of January 28th, and also that he had given her alcoholic drink. He denied the use of force, and explained the bruises on her body as the result of a brush up against an object or, perhaps, from too tight a hold on her as he escorted her from place to place. He acknowledged that they had performed sexually before. S.D., herself, admitted prior sexual encounters with Dighera. She stated also that on that January night, no actual physical force was brought to bear on

her. She could not explain the bruises on her body.

The defendant contends that the testimony of the prosecutrix, taken in full context, presents such a contradictory and self-destructive narrative as to deny it probative effect for an inference of coerced rape. That account describes these events:

Q. Did you leave with him [Dighera] the night of January 28th?

A. Yes, yes.

Q. Why did you leave with him?

A. He can—for—he can for—force me to which I know I have been forced in having sex with him.

Q. The night of January 28th, did—

A. I have been forced.

MR. COLANTUONO: Your Honor, I would object as being non-responsive to a question.

THE COURT: Sustained.

Q. [By Mr. Knight] Sharon, did he take you some place January 28th? Where?

A. Yes. I don't know.

Q. Was it—

A. To the—t-i-w-n places. I—both Jerry—Jerry's and Steve's place.

Q. Is—all right. When—when you arrived at that place, did you have anything to drink?

A. Only too much beer. It was illegal beer for me.

Q. Did you ask him for something other than beer?

A. No. I don't know.

Q. All right. How many beers do you think you had?

A. I don't know. I don't know. I don't know, maybe ten or oh, I don't know. I don't know.

Q. Do you know how many people were there?

A. No, three, only Jerry and Steve first.

Q. Did you have sex with Jerry Dighera?

A. I—it is not sex. I call it rape.

Q. Did you want him to have sex with you?

A. I was thinking it was rape, yes, not really sex.

Q. Were you....

A. I don't call it sex. If it was sex, it will do no harm. But if it was rape, it do harm.

Q. Were you....

A. Because....

Q. Go ahead.

A. I had got—gotten a bad infection and the doctor found—

MR. COLANTUONO: Your Honor, I would object to anything....

A. [By the Witness]—bruises.

MR. COLANTUONO: ....stated by the doctor.

THE COURT: Sustained.

\* \* \* \* \* \*

THE COURT: All right, ladies and gentlemen, I am going to ask you to disregard everything that the doctor said or may have said. The interpreter will—when an objection has been made and sustained, you will not question the witness further on that particular point.

THE INTERPRETER: Excuse me, sir. When an objection is made, is it okay if I tell Sharon by tapping her here [indicating], so that she will know to stop talking?

THE COURT: Yes.

THE INTERPRETER: Okay.

Q. [By Mr. Knight] Sharon, were you afraid of Jerry Dighera?

MR. COLANTUONO: I object as being leading.

THE COURT: Overruled.

A. [By the Witness] Yes, I—but I have not been—I could not show them my fear.

Q. Why?

A. Fears. Oh, I—because I did not love them.

Q. Did Jerry Dighera insert his penis into your vagina?

A. Yes, yes, yes, yes.

\* \* \* \* \* \*

Q. Sharon, were you married to Jerry Dighera at the time?

A. No, no, no, no, no, no. I am getting married to Mike. I have . . . .

MR. COLANTUONO: I would object as being non-responsive to a question.

THE COURT: Sustained.

Q. [By Mr. Knight] Are you getting married to Mike?

A. Yes. It—but—

MR. COLANTUONO: Object as being non-responsive to a question.

THE COURT: I haven't heard the answer yet, counselor.

Q. [By Mr. Knight] Sharon, did you have sex with Jerry Dighera prior to January 28th?

A. I had never—

THE INTERPRETER: Excuse me.

A. [By the Witness] Several—several—several—a-c-c-u-s-i-n-g-s-e-x before I got raped by them. I called them—let me think—first time when Jerry lived in the apartments with me being a manager I called the first sex a-c-c-u-s-i-n-g—accusing—accusing, and then on January 19th Jerry got fired, and later on January 28th Jerry came and saw me again and raped me at home.

The defendant concedes that the testimony of a victim of rape needs no other corroboration for submission of the offense to the jury. *State v. Baldwin*, 571 S.W.2d 236, 239[1, 2] (Mo.banc 1978). The defendant contends, however, that the testimony of the prosecutrix was so garbled as to invoke the principle that, absent other evidence of a sexual imposition or coercion by the defendant, there was no valid evidence from which the guilt for rape could be inferred. *State v. Burton*, 355 Mo. 467, 196 S.W.2d 621, 622[1] (1946). The argument refers specifically to the questions and responses:

Q. Did you have sex with Jerry Dighera?

A. I—it is not sex. I call it rape . . . If it was sex it will do no harm. But if it was rape, it do harm . . . Because . . .

I had go—gotten a bad infection and the doctor found . . . .

The defendant argues that this testimony by the prosecutrix betrays her misconception of rape as a sexual intercourse from which a disease results, not an act nonconsensual and compelled. The sense of the contention is that there was no other evidence of lack of consent by S.D. or use of force by Dighera upon her for the carnal purpose and, so, absent other evidence or circumstances to prove those elements, the cause was not submissible to the jury. The defendant argues further—that the other evidence shows S.D. as a female promiscuous and eager for sexual encounters, and already accustomed to intimacy with Dighera.

The only evidence—other than by the prosecutrix—of the activity among the three, S.D., Dighera and Fry, was the testimony of witness Starzman.[4] He was the upper floor tenant of Fry. In the late night of January 28th, he was out of beer and since it was very cold out, he telephoned Fry for an extra bottle. The back hallway door was opened to him to this scene of dalliance: Fry was altogether unclad, with priapus in erection. The deaf, blind and mute girl was nude, and groaned as she caressed her body with an effigy of a penis. Dighera had on pants. The three laughed, talked and danced in apparent enjoyment. They were intoxicated and continued to drink. They brushed against each other and hugged one another. He saw no sign of coercion or constraint against the girl. [The prosecutrix testified that Dighera placed her hand upon the generative organ of the visitor Starzman but that he rejected that advance.] The witness described them as "three peas in the same pod" and found the scene "disgusting."

We may agree that, the nonresponsive insinuation of the prosecutrix apart, there was no evidence that she submitted to the

---

4. Two witnesses, Hamilton and Clark, were at the Fry apartment when S.D., Dighera and Fry arrived that night of January 28th. They saw no evidence of coercion against S.D. Hamilton testified that the sight of them gave him no particular concern but incited him "somewhat" to disgust. Clark testified that he noticed no physical resistance to her presence there by S.D. nor any attempt by her to get away.

sexual act because the defendant Dighera asserted actual physical force against her. The act of rape, however, is also proved by a *threat* of force against the person of the other.[5] The excerpts rescripted from the testimony of the prosecutrix, taken most favorably to the finding of guilt, are substantial for an inference that she submitted to the sexual assaults under threats by Dighera of serious injury to her person. That evidence allows the inference, also, that the sexual conduct upon her was without her consent.[6]

The full evidence shows not only an utterly helpless female, but that Dighera was at one time the manager of the Wrenmoor and so had available a key to the apartment kept by S.D. The evidence was, also, that prior to the January 28th encounter, Ryan had warned Dighera against other advances towards S.D., and also that he was not to give her alcoholic drinks. Thus, the testimonial colloquy of the prosecutrix includes these responses in addition to those already rescripted for reference by the defendant Dighera:

Q. When you met Jerry and Steve on January 28th, were you in the lobby of the apartment building?

A. When I saw—not meet—that would be before January 28th, so when they came back I was in the lobby and that is how they saw me.

Q. When they saw you in the lobby, did they ask you if you wanted to go with them?

A. Yes.

Q. Did you go to your apartment so you could get your coat and go with them?

A. The—Jerry [Dighera] followed me upstairs because if—because I locked my apartment, *he will have the key*.

Q. Did you—Jerry open your apartment for you?

A. No, no, no. I did not have it locked.

Q. Did you get your coat so you could go with Jerry?

A. Yes, but *I looked scared* because I was looking down at the floor.

[emphasis supplied]

Dighera drove them to the Fry residence [so her narrative continues]. They communicated with each other by writing—she by pencil and paper, he by finger-writing on the palm of her hand:

Q. [D]id you tell us that the only words he wrote were "love," "care," "coke," and "beer"?

A. Um-hum, um-hum, yes, yes, *but I did not have a coke. Jerry first take ... asked me if I was—wanted beer—no, no, no, no, no, coke, and all he got me was beer. He was a liar.*

Q. Did you keep drinking the beer?

---

**5.** The defendant was charged under § 566.030.1 of the Criminal Code, effective January 1, 1979. That section [since amended in other details by Laws 1980] provided:

566.030 Rape.—1. A person commits the crime of rape if:

(1) He has sexual intercourse with another person to whom he is not married, without that person's consent by the use of forcible compulsion; ....

*Forcible compulsion* [as defined in § 556.-061(11) means either:

(a) Physical force that overcomes reasonable resistance, or

(b) A *threat, express or implied*, that places a person in reasonable fear of death, serious physical injury or kidnapping of himself or another person. [emphasis added]

Comment to the Sexual Offenses Chapter 566 definitions section [566.010] of the Code explains that *forcible* as used in the definition of rape under Code § 566.030 is identical to that meant for rape under repealed § 559.260: that is, that threats of violence to the person are equivalent to actual force to show a sexual assault on the victim. *State v. Adams*, 380 S.W.2d 362 (Mo.1964); *State v. Cunningham*, 100 Mo. 382, 12 S.W. 376 (1889). See, also, The New Missouri Code: A Manual for Court Related Personnel, Chapter 11, § 11.2 Comments; MAI–CR Comments, Rape, p. 6, Resistance.

**6.** The crime of rape under § 566.030.1 encompasses four elements:

1. sexual intercourse
2. with another person to whom the accused is not married
3. without the consent of that other person, and
4. by forcible compulsion.

The defendant Dighera concedes the acts of sexual intercourse and that he was not then married to S.D. The only issues are whether S.D. consented to the acts and whether she submitted under forcible compulsion.

A. *He kept giving it to me and I almost forgot it. I was going to stop it, but he kept making me drink it.* [emphasis added]

\* \* \* \* \* \*

Q. Did you hit or push Jerry [Dighera] or Steve [Fry] at Steve's house?

A. *I could not do it because* I think it is wrong, and *I can get brutally beat up.*

Q. Did you hit or push Jerry at Jerry's house?

A. *No, no, no, no, same problem, brutally beaten up.*

Q. When you had sex at Steve's house, what room was it in?

A. I don't know. Both the—oh, bedroom.

Q. Before you went into the bedroom, were your clothes taken off?

A. Oh, let me think. I don't know. I—it is—it seem a long way back. Let me think. I don't know because *I was drunk when I had to have sex, that before I had sex, I got drunk.*

[emphasis added]

While still at the Fry residence, S.D. communicated to Dighera: "I want to go home now. I don't want to stay." Dighera told her he would try to get a cab, "but he made me wait till morning."

After that refusal, Dighera accompanied S.D. over snow and ice to his apartment where, by his admission to the police, he performed another act of sexual conjunction with S.D. The next morning, Dighera placed S.D. in a taxicab for delivery to her home.

▆ This evidence allows the finder of fact to infer that the consent to accompany Dighera and Fry was for a social occasion and was not a consent to copulation. That once arrived at the Fry residence, Dighera deceived S.D. and plied her with alcohol against her will until she became drunk, and in that state the sexual act ensued. Then, against express wish, she was refused return to her home but was led to the Dighera residence and another act of sexual conjunction. The evidence allows the inference, also, that S.D. submitted under threat of force: that she resisted neither Dighera nor Fry because she "could be brutally beaten up." The quality of resistance the law expects in the face of imminent sexual assault is only that equal to the possibility. Where resistance is futile or not otherwise feasible from physical incapacity to resist a threat of violence, the law expects none. *State v. Wynn,* 357 S.W.2d 936, 939[2] (Mo. 1962); *State v. Catron,* 317 Mo. 894, 296 S.W. 141, 143[3–4] (1927); § 566.010, Comment: The New Missouri Code: A Manual for Court Related Personnel, Chapter 11, § 11.2 Comments.

▆ As an assent induced by fear of violence to the person is no consent, so an assent given under intoxication is no consent.[7] *State v. Walters,* 98 S.W.2d 527, 528 (Mo.1936); *State v. Atkins,* 292 S.W. 422, 426 (Mo.1926). The evidence allows inference that the sexual activity at the Fry premises was forced by threat of injury to S.D. and by a consent induced and exploited in an intoxicated stupor. The evidence allows inference also that S.D. was then conducted by Dighera to his quarters against her will and protest, and that S.D. was without physical defense to resist so that the sexual imposition upon her by Dighera

---

7. The Code definition of *consent* [§ 556.061(4)] was submitted as Instruction No. 14:

Consent. Consent or lack of consent may be expressed or implied. Assent does not constitute consent if

(a) It is given by a person who is legally incompetent to authorize the conduct charged to constitute the offense and such incompetence is manifest or known to the actor; or

(b) It is given by a person who by reason of youth, mental disease or defect, or intoxication, is manifestly unable or known by the actor to be unable to make a reasonable judgment as to the nature or harmfulness of the conduct charged to constitute the offense; or

(c) It is induced by force, duress or deception.

[emphasis added]

Instruction No. 14 was given to define *consent* as used in paragraph Third of the rape verdict-director Instruction No. 6:

Third, that defendant did so [had sexual intercourse with S.D.] without her consent by the use of forcible compulsion.

thereafter was rape, forced and without consent. The testimony of the prosecutrix was not inherently contradictory, as the defendant contends. Nor does the testimony of the proneness of the prosecutrix to promiscuity or the episode of amorous gaiety and libidinous display at the Fry residence dissipate the inference of coerced sexual intercourse by Dighera upon S.D. It was for the jury to assess the inference of coercion against the inference of voluntary consent the disparate evidence raises. *State v. Baldwin*, supra, 571 S.W.2d 236, 240[5] (Mo.banc 1978).[8]

▆▆▆▆ The defendant Dighera contends nevertheless that the conviction cannot stand because of instruction error. The Criminal Code discloses the rationale that [except as to the instances described in § 562.026] criminal liability rests on acts done with a culpable state of mind—that is, *purposely, knowingly, recklessly* or *with criminal negligence.* § 562.016. If the definition of an offense [other than those excepted by § 562.026] does not expressly prescribe a culpable mental state, "a culpable mental state is nonetheless required and is established if a person acts purposely or knowingly or recklessly, but criminal negligence is not sufficient." § 562.021. The crime of rape under § 566.030 of the Criminal Code [as predecessor § 559.260] does not prescribe an intent as an element of the offense. *State v. Lebo*, 339 Mo. 960, 98 S.W.2d 695, 697[3, 4] (1936). Thus, that crime is accomplished if the accused acts *purposely, knowingly* or *recklessly.* § 562.-016. The trial court quite properly submitted, therefore, that the defendant Digh-

8. The prosecution argues that the sufficiency of the evidence as to a *forcible* rape notwithstanding, the offense was proved by testimony that the capacity of S.D. to *consent* was vitiated by the induced intoxication and that circumstance alone suffices to submit the issue of forcible rape under § 566.030. The pre-Code law was to that effect. Thus, a sexual intercourse upon a female induced into intoxication was rape under § 559.270 [carnal knowledge of a woman, without her consent, by administration of a substance or liquid "which shall produce such stupor or such imbecility of mind . . . as to prevent effectual resistance"]. The coercion was the inability of the victim to resist from the induced intoxication. *State v. Walters*, 98 S.W.2d 527, 528 (Mo.1936). It was also rape under general rape statute § 559.260 [carnal knowledge by forcible ravishment of a woman] for a male to impose sexual intercourse upon a female who was then asleep [*State v. Welch*, 191 Mo. 179, 89 S.W. 945 (1905)], or surprised into the act [*State v. Atkins*, supra, 292 S.W. 422 (Mo.1926)] or too weak of intellect to know the consequence of the act [*State v. Cunningham*, supra, 100 Mo. 382, 12 S.W. 376 (1889)]. The rationale under that former general statute was that the disability, in each case, vitiated capacity for consent, so that the mere physical entry attendant to penetration of the female organ was force sufficient to constitute rape. That rationale treats force and consent as correlatives. If there is force, there is no consent. If there is consent, there is no force. *State v. Welch*, supra, 191 Mo. 179, 89 S.W. 945, 947 (1905); *State v. Cunningham*, supra, at 378. The recently enacted Criminal Code disrupts that common law correlation. The Criminal Code repeals § 559.270 [rape of a drugged victim] and other former sections, distinguishes between *forcible* and *consensual* sexual acts, and reorders them accordingly. The *forcible* sexual acts [rape—§ 566.030] are classified as the more serious crimes and the *consensual* sexual acts [e. g., sexual assault—§ 566.040] are classified as the less serious crimes. Thus [according to the commentary—The New Missouri Code: Manual for Court Related Personnel, Chapter 11, Sexual Offenses] "[n]onforcible sexual intercourse with a person who is incapacitated is . . . separated from forced acts" and is no longer rape. Rape is only when the accused "uses *physical force* that overcomes *reasonable resistance.*" [p. 11–3]. Thus a man who imposes sexual intercourse upon a woman incapacitated to give consent to the sexual act within the definition of § 556.061(12) ["Incapacitated means that physical or mental condition . . . in which a person is unconscious, unable to appraise the nature of his conduct, or unable to communicate unwillingness to act"] does not commit rape—if in the process no *physical force* is used—but only sexual assault. This rationale does not consider the physical invasion of the incapacitated female as an act of force, but anomalously, as an act not resisted and therefore consented to. More anomalously, physical force which overcomes resistance and consent is rape, but guile which vitiates the capacity to consent—and thus makes resort to force unnecessary is not rape. If, as authority has it [Richardson, Mo. Bar Committee Comments on MAI–CR, p. 5], the interest protected by the rape statute is the right of the person to "privacy, bodily integrity, human dignity, and freedom from distasteful or traumatic sexual experiences," the reordered classification of the sexual act upon the incapacitated female as less than rape misses that desideratum.

era was guilty if he acted at least recklessly as to the elements of the crime of rape.[9] The definition of *recklessly* is defined in § 562.016.4 and is rescripted for the purpose of trial instruction in MAI–CR 2d 33.01:

A person acts recklessly or is reckless when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation.

Where an instruction submits the culpability for the offense rests on an act done with a reckless state of mind [Instruction No. 11] then a separate instruction must also be given to define *reckless* and *recklessly*, whether or not requested. MAI–CR 2d 2.37.2, Notes on Use 3. The failure to give the definition instruction, therefore, submitted an incomplete statement of the law of the case, Rule 28.02(a). The usual consequence for such a lapse is error, the prejudicial effect to be judicially determined, Rule 28.02(e).

▉ The defendant did not preserve the contention, however, and asks review for plain error under Rule 29.12(b). The burden rests on the proponent to show that manifest injustice or miscarriage of justice resulted from the error. In this proof, there is a palpable distinction between prejudical error and plain error. There is plain error only when a manifest injustice or miscarriage of justice results. *State v. Miller*, 604 S.W.2d 702, 706[3–6] (Mo.App.1980). In terms of instructions, therefore, there is no plain error unless the trial court has so misdirected or failed to instruct the jury on the law of the case as to cause manifest injustice. *State v. Murphy*, 592 S.W.2d 727, 733[17, 18] (Mo.banc 1980). The submission of a truncated version of a mandatory bur-

den of proof instruction [MAI–CR 2.20] was not plain error when the proposition omitted was given expression in other instructions. *State v. Holt*, 592 S.W.2d 759, 776[31] (Mo.banc 1980). So, also, the neglect to submit by separate instruction the mandatory definition of *deadly force* in a prosecution for assault in the first degree was not plain error where the other required definitions were duly submitted. *State v. Cass*, 614 S.W.2d 784 (E.D.Mo. App., 1981).

In this case, the jury was directed [Instruction No. 11] to convict if the defendant Dighera acted recklessly as to whether S.D. consented to the intercourse. That instruction rested the burden to prove, not only that S.D. did not consent, but that the defendant was reckless to act on the premise that S.D. consented. That instruction further directed that if the defendant Dighera believed S.D. consented then he was not reckless. The gist of the MAI–CR 2d 33.01 definition of *reckless*—erroneously omitted from submission—is simply that recklessness is conduct done with an awareness of the risk and a conscious disregard of that risk. [See, The New Missouri Criminal Code: Manual for Court Related Personnel, Chapter 7, General Principles of Liability § 7.3, Comments.] That definition conforms to the usual dictionary equivalent for the term: *lacking in caution, deliberately courting danger.* Webster's Third New International Dictionary. The defendant suffered no manifest injustice by the neglect to submit MAI–CR 2d 33.01.

The judgment and conviction for rape under Count I is affirmed.

▉ The defendant Dighera was convicted also under Count II for sodomy against S.D. A person commits the crime

---

9. Instruction No. 11:

One of the issues as to Count I [rape] is whether the defendant acted recklessly with regard to whether S.D. consented to the act. The State has the burden of proving beyond a reasonable doubt not only that S.D. did not consent to the act, but also that the defendant acted recklessly with regard to S.D.'s consent. If the defendant believed that S.D. consented to

the act, then he was not reckless as to S.D.'s consent.

If you find that the defendant believed that S.D. consented to the act, or if you have a reasonable doubt as to whether he believed that S.D. consented to the act, or if you have a reasonable doubt as to whether the defendant was reckless as to S.D.'s consent, you must find the defendant not guilty under Count I.

of sodomy under § 566.060.1(1) if: "[h]e has deviate sexual intercourse with another person to whom he is not married, without that person's consent [10] by the use of forcible compulsion." The proof of the offense was from the prosecutrix alone and consisted altogether of this brief testimony:

Q. Did Jerry Dighera insert his penis into your vagina?

A. Yes, yes, yes, yes.

Q. Did he insert his penis into your mouth?

A. Yes, yes, yes.

Q. *Did you want him to insert his penis into your mouth?*

A. *I,* um, *could not tell him no* to—but it made me sick, and *it was—telling him to stop, but he did not.*

Q. Did he push your head down?

[Objection—overruled]

Q. Did he push your head down to his penis?

A. Not his, but Steve's, Steve's.

[emphasis added]

Then defendant Dighera contends that this testimony contradicts itself as to whether *the act* of sodomy was between herself and Dighera or herself and Fry, and thus is not probative of either inference. The testimony describes *two acts* of sodomy, not one, as the defendant supposes. The evidence allows the reasonable inferences that the first act of sodomy was enforced by Dighera upon S.D. for consummation upon his own priapus, and the second act of sodomy was enforced by Dighera upon S.D. for consummation upon the sexual organ of Fry. The conviction under Count II was under an indictment and proof that Dighera coerced S.D. to deviate

sexual intercourse without her consent. The testimony of the prosecutrix is ample basis for the proof of the charge.

The elements of the crime of sodomy under § 566.060 are (1) a deviate sexual intercourse (2) with another person to whom the actor is not married (3) without the consent of that other person, and (4) by forcible compulsion. These were submitted by Instruction No. 8 on the model of MAI-CR 2d 20.08.1. The evidence amply proves a *deviate sexual intercourse* within the definition of the offense [11] and that Dighera and S.D. were not then married. What uncertainty of proof there is relates—as under Count I for rape—to the elements of force and consent. The same *threat of force* we found induced S.D. to submit without consent to the rape was—by legitimate inference—the inducement for S.D. to submit to the intrusion of the Dighera genital into her mouth. The same incapacity to resist the rape—by legitimate inference—persisted to deprive the deviate sexual activity with Dighera of consent.[12]

The jury was directed to convict if the defendant Dighera acted recklessly as to whether S.D. consented to the deviate sexual intercourse—[a counterpart instruction to Instruction No. 11 given on the rape count]. The court neglected to define *reckless* as required by MAI-CR practice. The defendant did not preserve that error, either as to the rape submission or the sodomy submission. We rule against the contention that the lapse was plain error for the same reasons we give to deny relief on that ground against the rape conviction.

The judgment and conviction for sodomy under Count II is affirmed.

All concur.

---

10. The sodomy component [§ 566.060] of the new Criminal Code does not regulate deviate sexual conduct between those in consent. [See, Comment to § 566.060]. The consent or lack of consent was irrelevant to charge and conviction under repealed sodomy statute § 546.330. *State v. Russell,* 581 S.W.2d 61, 66[2–5] (Mo.App.1979).

11. The definition of *deviate sexual intercourse* given in MAI-CR 2d 33.01—"any sexual act involving the genitals of one person and the mouth, tongue, hand or anus of another per-

son"—was submitted by separate instruction as required by the Notes on Use to Sodomy: Forcible Compulsion MAI-CR 2d 20.08.1.

The definitions for *consent* and *forcible compulsion* were also given as required.

12. The definitions of *consent* and other terms were made applicable by the express terms of Instruction No. 14 to *all* the submissions—and so were considered by the jury on both the rape and sodomy counts.