STATE of Missouri, Respondent,

v.

**Ronald S. DENNIS, Appellant.**

No. WD 62279.

Missouri Court of Appeals, Western District.

Feb. 1, 2005.

Sarah Weber Patel, Kansas City, MO, for appellant.

Deborah Daniels, Assistant Attorney General, Jefferson City, MO, for respondent.

Before BRECKENRIDGE, P.J., SMART and HOWARD, JJ.

PATRICIA BRECKENRIDGE, Judge.

Ronald S. Dennis appeals his convictions and sentences for aggravated rape, under section 566.030, RSMo 1986, and first degree assault, under section 565.050, RSMo 1986. On appeal, Mr. Dennis argues that the trial court erred in instructing the jury, accepting the jury's verdict, and sentencing him for both first degree assault and aggravated forcible rape in violation of his right to be free from double jeopardy because first degree assault is a lesser-included offense of aggravated forcible rape. Mr. Dennis also contends that the trial court erred in denying his motion to suppress incriminating statements he made to police officers and in permitting his statements to be admitted into evidence at trial because his statements were involuntary. This court finds that first degree assault, under section 565.050, RSMo 1986, is not a lesser-included offense of aggravated forcible rape, under section 566.030, RSMo 1986,[1] and Mr. Dennis's statements were not involuntary. Accordingly, Mr. Dennis's convictions and sentences are affirmed.

**Factual and Procedural Background**

On February 28, 1987, H.B., then twenty-seven years old, was found unconscious at her home in Independence. She was lying on the floor in front of a couch, wearing only a robe and suffering from severe head injuries. Pry marks and a shoe print on the windowsill indicated that H.B.'s attacker had entered her house through her bedroom window. Mud was also discovered on H.B. and tracked throughout her house.

At the hospital, an examination to determine if she had been sexually assaulted was performed on H.B. Semen was found in H.B.'s vagina in a "pooled state," which indicated that she remained prone after ejaculation and the semen could have been in her vagina for a number of hours. H.B's injuries were severe. She remained in a coma for over four months and was in need of a respirator for a significant period of time. Her injuries resulted in a protracted and significant loss of brain function and created a substantial risk of death. H.B. required retraining of all her bodily functions. Her injuries also caused spontaneous bone growth in her thigh, and she was required to wear leg braces to straighten out her legs. H.B. eventually had to undergo surgery on her legs. Since the attack, H.B. has not been able to read or write and her ability to speak and make judgments is severely impaired.

In January 1993, H.B. was attacked a second time and her face was severely beaten. H.B.'s injuries from this second attack required a three-week hospital stay and her limitations from the first attack were magnified. H.B.'s second attacker was eventually convicted. While the police were investigating the second attack, H.B. stated that she remembered who attacked her in 1987. She told a police officer that her 1987 attacker was someone with whom she had previously worked. Police officers located an Alonso Hannon, who fit H.B.'s description. DNA testing of Mr. Hannon's blood, however, ruled out Mr. Hannon as a suspect. Thereafter, the vaginal swab obtained from H.B. was run through the

---

1. All statutory references are to the Revised Statutes of Missouri 1986, unless otherwise indicated. *See State v. Edwards,* 983 S.W.2d 520, 521 (Mo. banc 1999) (defendant is to be tried for an offense as defined by the law that existed at the time of the offense).

Missouri CODIS database.[2] In June 2000, it was determined that Mr. Dennis's DNA profile matched the DNA profile of the semen found on the vaginal swab. Neither H.B. nor any of her family or friends knew Mr. Dennis.

Detective Michael Johann of the Independence Police Department was assigned to H.B.'s case. Detective Johann discovered that Mr. Dennis was incarcerated in Farmington, Missouri. On August 2, 2000, after obtaining a search warrant for Mr. Dennis's blood, Detective Johann and Sergeant Kenneth Cavanah went to Farmington to interview Mr. Dennis. When the detectives arrived, Mr. Dennis was given his *Miranda*[3] rights, which he waived, and he proceeded to talk to Detective Johann and Sgt. Cavanah. Mr. Dennis was cooperative and willing to talk.

During the interview, Detective Johann showed Mr. Dennis a picture of H.B. Mr. Dennis stated that he did not know H.B. and he denied ever having sex with her. He said that he would remember H.B. because she was pretty and had a pretty face. Mr. Dennis claimed that he had memory problems because of a stroke and heart surgery and, therefore, he could not remember if he attacked H.B. He stated that he could have been the person who attacked H.B., but he could not remember. Mr. Dennis did admit to being "a very bad person around 1987," and that he "drank heavily" and "took pills." In particular, he said that he did remember an incident in 1987 when he caught his wife in bed with his best friend. He said that this discovery "tore him up" and, because he could not hurt his wife, he could have hurt another person. He further stated that he had sexual problems that he did not know how to deal with, and he admitted that in 1987, he hit a woman who allegedly had sexually teased him and refused to have sex with him.

Detective Johann also asked Mr. Dennis if he thought that he would ever be confronted in this case. Mr. Dennis answered, "No." Detective Johann told Mr. Dennis that it was important to H.B. for him to be sincere, that he should apologize to H.B., and that he should give them details of the attack. Mr. Dennis became emotional and cried during the interview and told the officers to tell H.B. that he was sorry and that he wanted to apologize to her in person. He, nevertheless, said that he could not give them details of the attack because he could not remember. He did, however, admit that the attack was a random event. The officers were forced to terminate the interview when Mr. Dennis had to return to his cell for a prisoner count. When this occurred, Mr. Dennis indicated that he wanted to continue to talk to the officers.

Detective Johann and Sgt. Cavanah returned to Independence with a sample of Mr. Dennis's blood, which was drawn at one point during the interview. Subsequent testing on Mr. Dennis's blood determined that the expected frequency that Mr. Dennis's DNA profile was the source of the semen recovered from H.B. was one in one quadrillion. On May 15, 2001, Detective Johann returned to Farmington to conduct a second interview with Mr. Dennis. Mr. Dennis again waived his *Miranda* rights. When Detective Johann asked Mr. Dennis for more details of the attack, Mr. Dennis again said that he could not remember and was not even sure he was the one who committed the attack. When Detective Johann confronted Mr. Dennis with the DNA results, Mr. Dennis

---

**2.** CODIS is an acronym for Combined DNA Index System.

**3.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

said that he was sorry for hurting the person but could not remember anything. After about two hours of questioning, during which Mr. Dennis continued to state that he could not remember the attack, Detective Johann stopped the interview and left.

Following Detective Johann's second interview with Mr. Dennis, Detective Johann determined that, during late 1986 and early 1987, Mr. Dennis lived with his girlfriend approximately four to five tenths of a mile from H.B.'s house in Independence. Detective Johann took a picture of the house and obtained an arrest warrant and a writ ad prosequendam for Mr. Dennis. Thereafter, on July 20, 2001, Detective Johann and Detective Robert West went to Farmington with the picture of the house, the arrest warrant, and the writ. They intended to interview Mr. Dennis, arrest him, and bring him back to Independence.

Before beginning the third interview, Mr. Dennis once again waived his *Miranda* rights. Detective Johann told Mr. Dennis that H.B. and her mother were not satisfied with his prior responses and that this was the final time he was coming and Mr. Dennis needed to be truthful this time. Mr. Dennis, however, once again claimed he could not remember, although, in response to the officers' questions, he was able to recall other events from both before and after the attack. When Detective Johann showed Mr. Dennis the photograph of Mr. Dennis's prior residence in Independence, Mr. Dennis stated that he did not recognize the house and denied ever living there. Eventually, Detective Johann told Mr. Dennis that he was going to call H.B. and tell her that Mr. Dennis was not cooperating and was still not sorry. Detective Johann then stepped out of the room for five minutes, pretending to call H.B. After he returned to the inter-view room, Detective West told Detective Johann that Mr. Dennis was still unable to remember any details. Detective Johann also told Mr. Dennis that he was going to call the prosecutor and have him fax over a writ. Detective Johann stepped out of the room again for five minutes to pretend to do this.

After nearly three hours of Mr. Dennis claiming to not remember what happened, Detective Johann told Mr. Dennis that he was under arrest and that they were taking him back to Independence. Detective Johann opened the interview room door and told the prison guard to shackle Mr. Dennis because they had a writ and a warrant and were taking him back to Independence. At this point, Mr. Dennis stood up, placed his hands on Detective West's arm, walked over to Detective Johann and put his hands on him, and then said that he would tell the truth about what happened. He also said, "I did it. I did this."

Mr. Dennis then proceeded to provide the details of the attack. Mr. Dennis said that he had a fight with his girlfriend on the night of the attack and left his house angry with women. He said that, as he was walking around his neighborhood, he found a big stick and eventually came upon H.B.'s house. Mr. Dennis stated that his original intentions were to rob her because he needed money. He claimed he entered H.B.'s house through the unlocked front door and startled H.B., who was lying down. Mr. Dennis could not remember, however, if she was in the living room or the bedroom. Mr. Dennis claimed that when H.B. saw him, she jumped up and screamed and cursed at him. He admitted that he hit her in the head several times, and when she was unconscious, he raped her and left. When the detectives asked Mr. Dennis what H.B. was wearing and what color her hair was, Mr. Dennis stated that she was wearing a robe, he thought

she was wearing panties, and that he thought she had brown hair. Detective Johann also asked Mr. Dennis if he stole a gold charm necklace in the shape of a teardrop with a pearl in it from H.B.'s house. Mr. Dennis admitted that he might have.

Following Mr. Dennis's confession, Detective Johann and Sgt. West drove Mr. Dennis to Independence. When they arrived in Independence, the officers took Mr. Dennis to an interview room and Detective Johann asked Mr. Dennis if he would give a videotaped statement. At this point, Mr. Dennis's demeanor changed, he became quiet, stated that he was not sure what he should do, and he asked to speak to his son. At one point in the interview, Detective Johann left the room to activate the recording equipment. The videotaped interview lasted a little over twelve minutes. Mr. Dennis did not say much during this twelve minutes. When Mr. Dennis invoked his right to counsel, the interview was terminated. Detective Johann then called Mr. Dennis's son. After Mr. Dennis talked to his son, Detective Johann took Mr. Dennis to detention, where he was "booked."

On July 23, 2001, as Detective Johann was preparing to take Mr. Dennis to his arraignment, Mr. Dennis told Detective Johann that he was going to do the right thing and give a videotaped statement. Detective Johann took Mr. Dennis to an interview room and then contacted Sgt. Cavanah and Lieutenant Denny Jensen. Detective Johann told Mr. Dennis how serious H.B.'s injuries were and that Mr. Dennis needed to tell him everything he could remember. Detective Johann also told Mr. Dennis that Lt. Jensen was an officer from Texas and that he needed to tell Lt. Jensen the truth about a rape he committed in Beaumont, Texas, in 1981. Mr. Dennis said it was hazy, but he admitted to raping a woman in Beaumont. Mr.

Dennis became emotional, cried, said that he was truly sorry for all the people he had hurt, and said that he wished he would not go to jail. Before a videotaped statement could be taken, however, Mr. Dennis invoked his right to counsel. Detective Johann then escorted Mr. Dennis to his arraignment.

On August 29, 2001, the State charged Mr. Dennis with the class A felony of assault in the first degree, under section 565.050, and the class A felony of aggravated forcible rape, under section 566.030. An information in lieu of indictment was subsequently filed, charging Mr. Dennis with the same two crimes and further alleging that Mr. Dennis was a prior and persistent sexual offender, which stemmed from an August 1984 guilty plea to sodomy in Lafayette County.

Mr. Dennis ultimately filed a motion to suppress the statements he made on August 2, 2000, May 15, 2001, July 20, 2001, and July 23, 2001. Specifically, Mr. Dennis asserted that his statements were involuntarily given because they were obtained by police coercion, in that he gave his statements based on the promise that he would not be prosecuted if he confessed to the crime. In addition, Mr. Dennis alleged that the statements he made on July 23, 2001, were involuntary because they were made without a *Miranda* warning and after he invoked his right to counsel on July 20, 2001. After hearing testimony on the motion to suppress, the trial court denied the motion. The trial court did not make any findings concerning its denial.

During a one-week trial, the State presented evidence that the DNA in the semen on the vaginal swab taken from H.B. matched Mr. Dennis's DNA. The expert for the State, Darvene Duvenci, testified that DNA testing was scientifically reliable and generally accepted in the scientific

community. She indicated that the odds of someone other than Mr. Dennis having the same DNA profile as that in the semen on the vaginal swab taken from H.B. were one in one quadrillion (i.e., a million billion). The State also presented evidence that the presence of Mr. Dennis's semen was contemporaneous with H.B.'s head injuries. In particular, Dolores Windham, the emergency room nurse who obtained the vaginal swab, testified that the semen was pooled in H.B.'s vagina, indicating that H.B. was never upright after Mr. Dennis had sexual intercourse with her.

There was additional evidence that H.B. was not married to Mr. Dennis. H.B.'s mother and Don Sapp, a close friend of H.B., both testified that they did not know Mr. Dennis. H.B.'s mother also stated that her daughter never mentioned anyone by the name of Ronald Dennis. And there was evidence of the seriousness of H.B.'s injuries. H.B.'s mother and Ms. Windham testified extensively concerning H.B.'s injuries, which initially left her in a coma for four months. Ms. Windham testified that H.B.'s injuries created a substantial risk of death and her head injury caused a protracted and significant loss of brain function.

There was further evidence that, during the time period surrounding H.B.'s attack, Mr. Dennis lived only a few blocks from H.B. and had a habit of taking long walks, by himself, at night. The State also introduced evidence that before H.B. was attacked, she had a gold charm necklace in the shape of a tear-drop with a pearl in it. After her attack on February 28, 1987, H.B.'s mother was never able to locate the charm. Kathleen Stawarz, Mr. Dennis's girlfriend, testified that in March 1987, Mr. Dennis gave her a charm matching the description of H.B.'s missing charm. At the conclusion of the trial, the jury found Mr. Dennis guilty on both counts.

Mr. Dennis filed a motion for judgment of acquittal or new trial in which he alleged, *inter alia,* that the trial court erred in admitting his statements to the police. Specifically, Mr. Dennis argued that his statements were involuntary because they were obtained by police coercion in the form of physical threats against him and on a promise that he would not be prosecuted if he gave a full confession. The trial court denied Mr. Dennis's motion for new trial and sentenced him to consecutive life sentences on each count. Mr. Dennis filed this timely appeal.

**Lesser Included Offense**

■ In his first point, Mr. Dennis claims that the trial court erred in instructing the jury, accepting the jury's verdict, and sentencing him for both first degree assault and aggravated forcible rape in violation of his right to be free from double jeopardy because first degree assault is a lesser-included offense of aggravated forcible rape. Mr. Dennis asserts that his due process rights were violated as guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution and by Article I, Sections 10 and 19 of the Missouri Constitution. Article I, Section 19 of the Missouri Constitution states, "nor shall any person be put again in jeopardy of life or liberty for the same offense, after being once acquitted by a jury." *See also State v. McTush,* 827 S.W.2d 184, 186 (Mo. banc 1992) ("Since appellant was never acquitted by a jury, the double jeopardy clause of the Missouri Constitution is without application to his case."). Because Mr. Dennis was never acquitted by a jury, his double jeopardy claim under Article I, Section 19 of the Missouri Constitution fails. Consequently, this court will address only his claim that his rights to due process under the United States Constitu-

918

tion and Article I, Section 10 of the Missouri Constitution were violated.

■ Mr. Dennis concedes that he failed to raise a claim of double jeopardy in the trial court, so he asks this court to review the issue for plain error. "Missouri courts have long enforced the rule that a defendant must raise a constitutional attack at the earliest opportunity, and his failure to do so preserves nothing for appellate review." *State v. Elliott,* 987 S.W.2d 418, 420 (Mo.App.1999). "[T]he constitutional protection to be free from double jeopardy is a personal right or privilege which is waived if not timely and properly asserted at trial...." *Id.* Nevertheless, the right to be free from double jeopardy is a constitutional right that goes " 'to the very power of the State to bring the defendant in the court to answer the charge brought against him.' " *Id.* at 421 (quoting *Hagan v. State,* 836 S.W.2d 459, 461 (Mo. banc 1992)). Thus, there is an exception to the general rule that the claim is waived when the court "can determine from the face of the record that the court had no power to enter the conviction." *Id.* Therefore, Mr. Dennis's claim is reviewed for plain error.

■ The double jeopardy clause of the United States Constitution protects defendants "from successive prosecutions for the same offense after an acquittal or conviction" and "from multiple punishments for the same offense." *McTush,* 827 S.W.2d at 186. Protection from multiple punishments " 'is designed to ensure that the sentencing discretion of the courts is confined to the limits established by the legislature.' " *Id.* (quoting *Ohio v. Johnson,* 467 U.S. 493, 498–99, 104 S.Ct. 2536, 2540–41, 81 L.Ed.2d 425 (1984)). "Double jeopardy analysis regarding multiple punishments is, therefore, limited to determining whether cumulative punishments were intended by the legislature." *Id.* Therefore, a defendant can be subjected to cu-

mulative punishment in a single trial, without offending the double jeopardy clause, in those cases where "the legislature has specifically authorized cumulative punishment under two statutes proscribing the same conduct." *Id.* The starting point in the analysis is a determination of whether the legislature intended to provide cumulative punishment for the crimes with which Mr. Dennis was convicted. *Id.* at 187.

■ Mr. Dennis was convicted for offenses he committed in February 1987, so his convictions for first degree assault and aggravated forcible rape were for the crimes as they were defined by the law that existed at that time. *State v. Edwards,* 983 S.W.2d 520, 521 (Mo. banc 1999). The version of section 565.050.1 in effect in February 1987, under which Mr. Dennis was convicted of first degree assault, provides that "[a] person commits the crime of assault in the first degree if he attempts to kill or knowingly causes or attempts to cause serious physical injury to another person." Mr. Dennis's conviction for aggravated forcible rape was based on the version of section 566.030 in effect in February 1987, which provides, in pertinent part:

1. A person commits the crime of forcible rape if he has sexual intercourse with another person to whom he is not married, without that person's consent by the use of forcible compulsion.

2. Forcible rape or an attempt to commit forcible rape as described in subsection 1 of this section is a felony for which the authorized term of imprisonment, including both prison and conditional terms, is life imprisonment or a term of years not less than five years, unless in the course thereof the actor inflicts serious physical injury on any person, displays a deadly weapon or dangerous instrument in a threatening manner or subjects the victim to sexual

intercourse or deviate sexual intercourse with more than one person, in which cases forcible rape or an attempt to commit forcible rape is a class A felony.

■ There is no language in sections 565.050 and 566.030 that addresses whether the legislature intended to punish first degree assault and aggravated forcible rape cumulatively. When the specific statutes do not address this issue, the general statute regarding cumulative punishments in section 556.041 is controlling. *See McTush*, 827 S.W.2d at 187.

■ Section 556.041 provides that "[w]hen the same conduct of a person may establish the commission of more than one offense he may be prosecuted for each such offense," but may not be convicted of more than one offense if "(1) [o]ne offense is included in the other, as defined in section 556.046[.]" Section 556.041. Subsection 1(1) of section 556.046 provides that an offense is an included offense when "[i]t is established by proof of the same or less than all the facts required to establish the commission of the offense charged[.]" In other words, "[i]f each offense requires proof of a fact that the other does not, then the offenses are not lesser included offenses, notwithstanding a substantial overlap in the proof offered to establish the crimes." *McTush*, 827 S.W.2d at 188. In determining whether multiple punishment is authorized under section 556.046.1(1), only the statutory elements of the offenses are relevant, not the evidence adduced at trial. *Id.*

The State argues that first degree assault is not a lesser-included offense of aggravated forcible rape because each offense contains an element not found in the other. In particular, the State asserts that the crime of rape requires proof of sexual intercourse, which is not required to prove first degree assault. Similarly, the State contends that first degree assault requires

proof of intent to kill or knowingly cause serious physical injury, while aggravated forcible rape under section 566.030 contains no intent element. Thus, the State concludes that first degree assault is not a lesser-included offense of aggravated forcible rape and, therefore, the trial court did not error in convicting and sentencing Mr. Dennis for both crimes.

■ The crime of aggravated forcible rape includes the element of sexual intercourse, which is an element that is not included in the crime of first degree assault. As correctly contended by the State, first degree assault requires proof of intent to kill or knowingly cause serious physical injury. The question, then, is whether intentionally or knowingly causing serious physical injury is an element that is not necessary to establish the crime of rape. With regard to an element of intent for the crime of rape, the Missouri Supreme Court has held that "[i]n rape, purpose and motive are irrelevant." *State v. Harris*, 620 S.W.2d 349, 355 (Mo. banc 1981). " 'If the evidence showed that there was carnal knowledge, force and the commission of the act, no intent is requisite other than that evidenced by the doing of the acts constituting the offense.' " *Id.* (quoting *State v. Tompkins*, 277 S.W.2d 587 (Mo.1955)). Therefore, the crime of aggravated forcible rape does not contain an intent element, which is an element included in the crime of first degree assault.

Nevertheless, Mr. Dennis contends that, even though section 566.030 does not contain a *mens rea* element, a culpable mental state is, nevertheless, required under section 562.021. Specifically, Mr. Dennis argues that because aggravated rape does not contain a culpable mental state, under section 562.021.3, the proper *mens rea* element is purposely or knowingly, which is

the same *mens rea* element under first degree assault. Thus, Mr. Dennis concludes, first degree assault is a lesser-included offense of forcible aggravated rape and the trial court erred in convicting and sentencing him for both crimes.

▮▮ Subsection 2 of section 562.021 provides:

*Except as provided in section 562.026 if the definition of an offense does not expressly prescribe a culpable mental state, a culpable mental state is nonetheless required and is established if a person acts purposely or knowingly or recklessly, but criminal negligence is not sufficient.*

(Emphasis added). This section was enacted in 1977, prior to the Court's decision in *Harris*. And while the Court's decision in *Harris* does not discuss section 562.021, the Supreme Court's subsequent decision in *State v. Beishir*, 646 S.W.2d 74, 77 (Mo. banc 1983), clarifies that the exception noted in section 562.021, i.e., section 562.026, is applicable to the offense of rape. Subsection 2 of section 562.026 provides that "[a] culpable mental state is not required . . . (2) If the statute defining the offense clearly indicates a purpose to dispense with the requirement of any culpable mental state as to a specific element of the offense." *Beishir* reasoned that the decision in *Tompkins*, which held that the crime of rape was a crime of strict liability, survived the enactment of section 562.021 based on section 562.026. 646 S.W.2d at 78. Thus, contrary to Mr. Dennis's argument, section 562.021 does not provide a culpable mental state for the offense of rape.[4] Thus, as discussed above, first degree assault and aggravated forcible rape each contain an element not necessary for

proof of the other offense. Accordingly, first degree assault is not a lesser-included offense of aggravated forcible rape and, therefore, double jeopardy did not prevent the trial court from convicting and sentencing Mr. Dennis for both crimes. Mr. Dennis's first point is denied.

### Mr. Dennis's Statements Were Voluntary

In his second point, Mr. Dennis asserts that the trial court erred in denying his motion to suppress the incriminating statements he made to Detective Johann, Detective West, and Sgt. Cavanah and in permitting his statements to be admitted into evidence at trial because his statements were involuntary. Specifically, Mr. Dennis contends that he was compelled to "talk" by the implied promise that he would not be prosecuted because the case was too old and that he should confess because H.B. and her family just wanted closure.

▮▮ Mr. Dennis challenged the admissibility of his statements by filing a motion to suppress and objecting to evidence of the statements at trial. "Once the admissibility of a statement has been challenged, the State bears the burden of demonstrating by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently made the statement." *State v. Bucklew*, 973 S.W.2d 83, 87 (Mo. banc 1998). "The proper focus of such a challenge is whether coercive police activity occurred." *State v. Smith*, 944 S.W.2d 901, 910 (Mo. banc 1997). "The test for whether a confession is voluntary is whether the totality of the circumstances created a physical or psychological coercion sufficient to deprive the

---

4. To the extent that this court's decisions in *State v. Bryant*, 756 S.W.2d 594, 597 (Mo.App. 1988), and *State v. Dighera*, 617 S.W.2d 524, 533 (Mo.App.1981), find that the crime of rape under section 566.030 requires that the culpable mental state be as set forth in section 562.021, they should no longer be followed.

defendant of a free choice to admit, deny or refuse to answer the examiner's questions." *State v. Simmons*, 944 S.W.2d 165, 173 (Mo. banc 1997). The waiver of *Miranda* rights, while not dispositive of the question of voluntariness, is an important consideration. *State v. Feltrop*, 803 S.W.2d 1, 13 (Mo. banc 1991). Other factors to consider include the "defendant's physical and mental state, the length of questioning, the presence of police coercion or intimidation, and the withholding of food, water, or other physical needs." *State v. Rousan*, 961 S.W.2d 831, 845 (Mo. banc 1998).

■■■■ Moreover, it is well settled in Missouri that "[a] confession resulting from a direct or indirect promise of leniency is inadmissible." *Simmons*, 944 S.W.2d at 175. In particular:

> [P]romises made must be positive in their terms or clear in implication ... if, even in general terms, they suggest an advantage to be gained by the confession, and if they are reasonably sufficient to induce and do causally induce an expectation or hope of worldly benefit as against the pending charge, it is enough to bar the confession.

*State v. Williamson*, 339 Mo. 1038, 99 S.W.2d 76, 79 (1936) (internal citation omitted). "[P]romises must also be promises of 'worldly advantage,' as distinguished from adjurations of a moral or spiritual nature; and they must be direct, as distinguished from collateral." *Id.* Promises "must have reference to the accused's escape from punishment, or to the mitigation of his punishment, for the crime charged, and not offer merely an opportunity for the gratification of his personal desires, or for his greater comfort, or for the granting of a benefit to some third person." *Id.*

During the suppression hearing, Mr. Dennis testified that, in the first interview with Detective Johann and Sgt. Cavanah, Detective Johann told him that, if he would admit to the crime, he would not be arrested and he would never see them again. He also testified that Detective Johann told him that the reason they needed Mr. Dennis to admit to the crime was because they wanted to "wipe the slate clean," "get this old case out of the way," and "let [H.B.] and her mom know what happened to put their mind at ease." Mr. Dennis testified that Detective Johann told him that he could not be prosecuted for rape because the three-year statute of limitations had run and, therefore, he might as well tell them what happened. Mr. Dennis also indicated that he never told the detectives anything incriminating in this interview. Mr. Dennis further stated that, after the first interview, he thought the detectives were satisfied that he could not admit to the crime and he would never see them again.

During the second interview, Mr. Dennis testified that Detective Johann wanted him to admit to the assault to make H.B. and her mom happy and give them peace of mind and comfort. Mr. Dennis stated that, after he told Detective Johann he had already told him everything he knew, Detective Johann became very angry, slammed his fist on the desk, and began to threaten him. In particular, Mr. Dennis testified that Detective Johann told him that if he did not tell him everything he wanted to hear that Detective Johann would "come back down here with a writ and get [Mr. Dennis] out, and get [Mr. Dennis] out of the protection of the prison," and that Mr. Dennis would "end up somewhere on a lonely dark road with a bullet in [his] head." Moreover, Mr. Dennis testified that Detective Johann was mad, cussing at him "like a dog" and threatening that he would find a way to "make [Mr. Dennis] pay."

During the third interview, Mr. Dennis testified that Detective Johann and Detective West told him that H.B.'s mom was unhappy that he had not admitted to the assault and that he might as well go ahead and admit to the crime because they were not going to arrest him. He further testified that Detective West told him that he was "going to crash and burn" if he did not tell them what they wanted to hear. Mr. Dennis stated that the detectives told him that if he would confess, they would go away, leave him alone, and that he "would not be arrested for anything connected with [H.B.'s] crime." Mr. Dennis testified that, in all of the interviews, Detective Johann told him "dozens of times" that if he would admit to the crime, they would not arrest him and they would cause him no trouble.

Mr. Dennis also testified that at one point during the third interview, Detective Johann left the room to go and call H.B. and her mom. While Detective Johann was out of the room, Mr. Dennis testified that Detective West told him he had to satisfy Detective Johann because if Detective Johann was not satisfied with his answers, they were going to take Mr. Dennis back to Independence because there was no statute of limitations on assault, even if there was a three-year statute of limitations on rape. Mr. Dennis testified that he believed Detective West and thought that if he did not say what the detectives wanted to hear, they would "take [him] out" and he would not be able to get out of prison at his scheduled time.

Finally, Mr. Dennis testified that during the third interview he confessed to the crime after Detective Johann said they were going to have him shackled and taken out. Mr. Dennis testified that the reason he decided to confess at this point was because he had a "flashback" about the threat to his life that Detective Johann had previously made. In particular, Mr. Dennis testified that "since [Detective Johann] threatened my life and since he has the power to take me out of here, he could kill me." He testified that he decided to confess at that point because "if [he] didn't, [Detective Johann] could kill me."

Mr. Dennis's testimony of what happened during the three interviews, however, is directly contracted by the testimony of Detective Johann. While Detective Johann testified that he might have given Mr. Dennis the impression that the statute of limitations had run on the charge of rape, he never told Mr. Dennis that he would not be prosecuted if he confessed to the crime. Contrary to Mr. Dennis's testimony, Detective Johann also testified that Mr. Dennis made incriminating statements in both the first and third interviews, prior to his detailed confession. For example, Detective Johann testified that Mr. Dennis admitted in the first interview that the assault on H.B. was a random act and that she did not do anything to provoke the attack. Detective Johann further testified that at no point did he ever make any threats to Mr. Dennis or use any force or coercion.

The evidence presented relating to the admissibility of Mr. Dennis's statements is reviewed in the light most favorable to the trial court's ruling. *Smith*, 944 S.W.2d at 910. Any conflicts in the evidence are for the trial court to resolve, and an appellate court must defer to the trial court's credibility determinations. *State v. Simms*, 131 S.W.3d 811, 814 (Mo.App.2004). Based on the trial court's ruling, it is clear that the trial court chose to believe Detective Johann's testimony rather than Mr. Dennis's testimony. The trial court was free to disbelieve Mr. Dennis's testimony that Detective Johann told him "dozens of time" that he would not be arrested if he confessed and that Detective Johann threat-

ened Mr. Dennis with physical violence. This court defers to the trial court's credibility determinations and, therefore, that Mr. Dennis's statements were voluntarily made and not made as a result of any promise of leniency, or because of any threats, force, or coercion. *Id.*

On appeal, Mr. Dennis recognizes that the trial court could have disbelieved his testimony, so he asserts, for the first time, that he confessed because of an implied promise of leniency based on Detective Johann's testimony that he may have given Mr. Dennis the "impression" that the statute of limitations on rape had run, and he did so to get Mr. Dennis to "talk." [5] Mr. Dennis's own testimony, however, refutes Mr. Dennis's claim that any "impression" Detective Johann created that the statute of limitations had run on rape was an implied promise that Mr. Dennis would not be arrested if he confessed. In particular, Mr. Dennis testified that before he confessed, Detective West told him that there was no statute of limitations on assault. Thus, any hope that Mr. Dennis may have had that he could not be arrested because the statute of limitations had run on the crimes he committed, should he confess, would have sprung " 'from the seeds of [Mr. Dennis's] own planting,' " and would be insufficient to render his resulting confession inadmissible. *State v. Schnick*, 819 S.W.2d 330, 336–37 (Mo. banc 1991) (citations omitted).

More importantly, however, the record refutes Mr. Dennis's argument that any implied promise of leniency induced him to confess. Specifically, Mr. Dennis testified that at the point that he was shackled and finally decided to confess, he had a flashback about Detective Johann's alleged threat. Specifically, Mr. Dennis testified that he decided to tell the detectives what they needed to know at this point because Detective Johann "threatened my life and since he has the power to take me out of here, he could kill me." In addition, he testified that he needed to do what they wanted him to do "because if I don't, he could kill me. So, I decided at that point that, yeah, I was going to say what they wanted me to say." Thus, it is clear from Mr. Dennis's own testimony that he confessed not based on a promise that he would not be arrested but, rather, because he was afraid for his life. The trial court did not believe Mr. Dennis's testimony that Detective Johann physically threatened him, which it was free to do. *State v. Howell*, 143 S.W.3d 747, 752 (Mo.App. 2004). Consequently, Mr. Dennis's argument that he confessed based on an implied promise of leniency is without merit.

■ Finally, in addition to consideration of any direct or implied promise of leniency, Mr. Dennis's confessions and statements must also be reviewed under the totality of the circumstances to determine if they were voluntary. *Simmons*, 944 S.W.2d at 173. On the first three occasions when the officers interviewed Mr. Dennis, he was advised of his *Miranda* rights and voluntarily waived those rights.[6] *Feltrop*, 803 S.W.2d at 13. Dur-

---

**5.** At the time Mr. Dennis committed the offense of forcible rape, the statute of limitations on forcible rape was three years and there was no statute of limitations for aggravated forcible rape. Sections 566.030, 556.036, RSMo 1986. The offenses committed in this case occurred in February 1987. Therefore, the statute of limitations on forcible rape expired in February 1990. Mr. Dennis was not charged until August 2001. In March 2002, section 556.036 was amended to include forcible rape in the provisions allowing a prosecution to commence at any time.

**6.** It is not necessary to analyze the significance of Mr. Dennis's failure to receive *Miranda* warnings during the last two interviews because he made no incriminating statements during either of those interviews.

ing the fourth interview, the officers immediately terminated the interview when Mr. Dennis said that he needed to talk to an attorney. Even though he had previously invoked his right to counsel, Mr. Dennis initiated the fifth interview. Moreover, none of the interviews with Mr. Dennis lasted for any protracted length of time. In fact, when Detective Johann was forced to terminate the first interview because Mr. Dennis had to be returned to his cell for a prison count, Mr. Dennis indicated that he did not want Detective Johann to leave and wished to continue the interview. During each interview, Mr. Dennis's physical needs were attended to; no requests for food, drink, or restroom breaks were denied. On the drive from Farmington to Independence, Mr. Dennis was given the opportunity to stop and use the restroom and was provided with food and medication. Detective Johann also allowed Mr. Dennis to speak with his son after he was transported to Independence. Based on the totality of the circumstances, the record does not support Mr. Dennis's claim that his statements were involuntary. Mr. Dennis's second point is denied.

Mr. Dennis's convictions and sentences are affirmed.

All concur.